## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph W. Ferrell, being first duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since May 12, 2019. Prior to joining the FBI, I served four and a half years in the United States Army, most recently as a Squad Leader in the 82nd Airborne Division, to include a ten month deployment to Afghanistan. After completing my enlistment with the Army, I was a Management Analyst on an Internal Performance Audit team with the National Science Foundation, working on an audit of government accountability for equipment purchased on multi-million dollar grants. Since joining the FBI, I have been assigned to an extraterritorial terrorism squad primarily investigating terrorism financing operations. I am assigned to the Washington Field Office of the FBI.

2.       This affidavit is being submitted in support of a criminal complaint alleging that MUZZAMIL ZAIDI (ZAIDI), ASIM NAQVI, ALI CHAWLA, and others known and unknown have conspired to provide services to Iran and the government of Iran (GOI), by collecting money in the United States on behalf of the Supreme Leader of the Islamic Republic of Iran, the Ayatollah Ali Husseini Khamenei (hereinafter, the Supreme Leader of Iran), and causing the money to be transported to Iran, without having first obtained a license from the Office of Foreign Assets Control (OFAC), as required by law, in violation of 50 U.S.C. §§ 1701-1705. The complaint also alleges that ZAIDI has acted within the United States as an agent of the GOI without having first notified the Attorney General, in violation of 18 U.S.C § 951.

3.       This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, law enforcement records, court-authorized searches, witness

Case: 1:20−mj−00163
Assigned To : Harvey, G. Michael
Assign. Date : 8/17/2020
Description: Complaint w/ Arrest Warrant

interviews, and my training and experience, as well as the training and experience of other law enforcement agents. When I provide in this affidavit direct quotations of statements made by defendants, they are often preliminary translations of statements that were made in the Farsi or Urdu language.

4.      Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts that I believe are necessary to establish probable cause that the defendants violated 50 U.S.C. §§ 1701-1705 and that ZAIDI violated 18 U.S.C. § 951.

## BACKGROUND

5.      Muzzamil Husnain Zaidi (ZAIDI) was born in 1984 in Karachi, Pakistan, and became a naturalized U.S. citizen on or about January 20, 2005. Since August 2014, ZAIDI has resided primarily in Qom, Iran, where he attended Al-Mustafa International University, but has traveled to the United States on occasion, most recently arriving in the United States on or about June 12, 2020. While in the United States, ZAIDI resides primarily in the Houston, Texas area. ZAIDI possesses a valid United States passport and two Pakistani passports. According to a copy of ZAIDI's resume recovered in a court-authorized search of ZAIDI's Yahoo! account,[1] ZAIDI was employed as a branch manager at two different U.S. banks from in or around 2006 to in or around 2010.

6.      Asim Mujtaba Naqvi (NAQVI) was born in 1984 in Karachi, Pakistan, and became a naturalized citizen on or about February 3, 2010. NAQVI primarily resides in the Houston, Texas

---

[1] Yahoo! records show that this account was created in 2002 and registered to a "Mr Muzzamil Zaidi" in Katy, Texas.

area. According to a draft resume recovered from ZAIDI's email account, NAQVI was employed as a personal banker and lead teller at a U.S. bank from in or around 2006 to 2008 and as a retail banker at a separate U.S. bank in or around 2008 to 2011.

7.      Ali Chawla (CHAWLA) was born in 1984 in Pakistan. He resided in the United States sporadically until 2014 and has resided outside the United States since 2014. Chawla resides in Qom, Iran, and is the director of Islamic Pulse, which is described below. CHAWLA is also affiliated with Jamiat Al Mustafa University.

8.       Jamiat Al Mustafa University, also known as Al-Mustafa International University (hereinafter, Al-Mustafa University), was rebranded in 2007 under the direction of the Supreme Leader of Iran in order to export Iran's revolutionary ideology. More than 45,000 foreigners from 126 countries have graduated from Al-Mustafa University since its inception. As of October 2016, it is estimated that there are nearly 25,000 individuals from 130 countries enrolled at the various branches of the university. The majority of individuals who attend the university study in Qom, where they live with their families.

9.      The GOI is a foreign power with which the United States has no formal diplomatic relations. The U.S. Secretary of State has named Iran a state sponsor of terrorism each year since 1984. As discussed below, the United States has imposed economic sanctions on Iran since 1995, and more recently, in June 2019, the United States imposed sanctions on the Supreme Leader of Iran.

10.      Beginning at least in or around December 2018 and continuing to at least in or around December 2019, in the District of Columbia and elsewhere, ZAIDI, NAQVI, and CHAWLA, and others known and unknown, have conspired to violate U.S. laws, including the U.S. sanctions on Iran, by collecting, in the United States, (1) a religious tax known as "khums"

on behalf of the Supreme Leader of Iran; and (2) other funds in the form of U.S. dollars, and causing those funds to be transported to Iran, including through Iraq and other countries. The defendants raised much of this money through a purported campaign to provide humanitarian assistance in Yemen organized by a pro-GOI website known as "Islamic Pulse." With respect to money collected in the United States, the defendants recruited others to carry the cash from the United States to Iran or Iraq (for eventual delivery to Iran) and caused the travelers to carry no more than $10,000 in order to avoid the filing of a Report of International Transportation of Currency or Monetary Instruments (CMIR) with United States Customs and Border Protection ("CBP") and/or law enforcement scrutiny.

11.     Beginning at least in or around December 2018 and continuing to at least in or around December 2019, in the District of Columbia and elsewhere, ZAIDI has acted in the United States as an agent of the GOI. In particular, ZAIDI has, under the authority of and on behalf of the Supreme Leader of Iran, collected money from persons residing in the United States and arranged to have that money transported to Iran, in violation of U.S. law.

## RELEVANT LEGAL PROVISIONS

### The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations

12.     The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1705, granted the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy or economy of the United States. Pursuant to that authority, the President may declare a national emergency through Executive

Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to impose economic sanctions on a foreign country.

13.     On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the GOI constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. *See* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

14.     To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), which is located in Washington, D.C., promulgated the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560.

15.     Absent permission from OFAC in the form of a license, the ITSR prohibit, among other things, the export, re-export, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods or services, including financial services, to Iran or the GOI. 31 C.F.R. § 560.204. This prohibition applies to (1) the transfer of funds, directly or indirectly, from the United States or by a U.S. person, wherever located, to Iran or the GOI, and (2) the provision of money remittance services, directly or indirectly, to Iran or the GOI. 31 C.F.R. § 560.427.

16.     The term "government of Iran," as used in the ITSR, includes, among other things, the state and government of Iran, as well as any political subdivision, agency, or instrumentality thereof; and any person to the extent that such person is, or has been, acting or purporting to act,

5

directly or indirectly, for or on behalf of the foregoing. 31 C.F.R. § 560.340. This definition includes the Supreme Leader of Iran and the Supreme Leader's Office and the Islamic Revolutionary Guard Corps (IRGC).

17.     On June 24, 2019, pursuant to IEEPA, the President issued Executive Order 13,876, imposing sanctions on the Supreme Leader of Iran and the Supreme Leader's Office. Exec. Order No. 13,876; 84 Fed. Reg. 30,573 (Jun. 26, 2019). These additional steps were taken in response to "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East [and] promote international terrorism." Executive Order 13,876 prohibits, by a United States person or with respect to property in the United States, the making of any contribution or provision of funds, goods, or services, by, to, or for the benefit of, any person whose property and interests in property are blocked pursuant to the order, including the Supreme Leader of Iran.

18.     While the ITSR authorize the transfer of funds involving noncommercial, personal remittance to Iran or for or on behalf of an individual in Iran, they prohibit such transfers to, by, or through the GOI. 31 C.F.R. § 560.550(a). Executive Order 13,876 further prohibits transfers by, to, or for the benefit of the Supreme Leader of Iran.

19.     Charitable donations of funds to Iran also require a specific license from OFAC.[2] Noncommercial, personal remittances do not include charitable donations to or for the benefit of

---

[2] OFAC has issued a general license authorizing nongovernmental organizations (NGOs) to export or re-export services to, or related to, Iran in support of certain not-for-profit activities designed to directly benefit the Iranian people. *See* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran_gle.pdf. The license further authorizes NGOs to transfer up to $500,000 per year in support of such activities. The license does not, however, authorize U.S. persons to transfer financial donations directly to Iran or NGOs in Iran. Furthermore, the license does not authorize the export or re-export of services to sanctioned individuals, including, as of June 24, 2019, the Supreme Leader of Iran.

an entity or transfers of funds for use in supporting or operating a business. 31 C.F.R. § 560.550(b). Executive Order 13,876 further prohibits the making of donations of food, clothing, and medicine to, or for the benefit of, the Supreme Leader of Iran, finding that such donations would "seriously impair … the ability to deal with the national emergency [declared in the order]."

20.     The ITSR, specifically 31 C.F.R. § 560.203, and Executive Order 13,876 further prohibit any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR and Executive Order 13,876.

21.     Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued by statute, including the ITSR and Executive Order 13,876. 50 U.S.C. § 1705(a).

## Agent of a Foreign Government

22.     Section 951 of Title 18 of the United States Code makes it a crime to act within the United States as an agent of a foreign government without prior notification to the Attorney General. "Agent of a foreign government" is defined, with certain exceptions not applicable here, as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d).

## BACKGROUND ON KHUMS, THE YEMEN CIVIL WAR, AND THE ISLAMIC PULSE CAMPAIGN

23.     The information in this section is based on open sources, including U.S. government websites.

## Khums

24.     Khums, which means "one-fifth" in Arabic, is a religious tax imposed as a jurisprudential tenet of Islam. Within Shia Islam, the dominant Islamic sect in Iran, individuals are

required to pay twenty percent of their unused annual income to the Imam, the head of the Islamic State, through his surrogates known as maraji (sing. marja).[3] As the Imam is believed to be in another realm, the representative of the twelfth Imam, the Supreme Leader of Iran, is recognized as the head of the Islamic State. The Supreme Leader of Iran and other surrogates of the Imam are authorized to collect khums money on the Imam's behalf. As of 2017, there were 86 such surrogates worldwide, with the Supreme Leader of Iran being among the most prominent. Sayyid Ali al-Husayni al-Sistani ("Sistani") is another prominent Iranian surrogate, living in Iraq.

25.     Khums are paid to the Supreme Leader of Iran, and other marja, through each marja's designated representatives, who are authorized in writing to collect on the marja's behalf. The Supreme Leader of Iran determines how khums are used in Iran and/or within the GOI; he (or his office) also provides official receipts to his representatives, such as ZAIDI, who are then responsible for providing those receipts to the persons who paid khums.

26.     Without a receipt, a person's religious obligation to pay khums has not been relieved. According to a fatwa, a ruling or legal opinion under Islamic law, issued by Sistani's office, "for those who pay their religious dues that their fulfillment is not complete by just delivering their dues to an authorized agent/Wakeel, rather they are obligated to ask him for a receipt which is issued by us (our offices). Otherwise, the payer's obligation is not considered fulfilled without an official receipt even though the cause may be due to forgetfulness, inadvertent mistake, or otherwise."

---

[3] A marja is a Grand Ayatollah with the authority given by an Islamic seminary to make legal decisions within the confines of Islamic Law for followers and lower-ranking clerics.

**Yemen Civil War**

27.     Since approximately 2015, two factions have been fighting for control of Yemen: the current government of Yemen and the Houthis, a Shia militant group. According to a 2019 U.S. Department of State report on terrorism, the Iranian regime continued to foment violence, both directly and through proxies, in several countries, including Yemen. Iran provided weapons and support to the Houthis, who share Iran's Shia ideology, and the IRGC, a branch of Iran's armed forces, continued to maintain a presence in areas of Yemen controlled by the Houthis. Saudi Arabia—Iran's key ideological and geopolitical adversary in the region—has been supporting the current Yemeni government.

**Islamic Pulse**

28.     Islamic Pulse is a publicly-available multimedia website that hosts images, videos, and articles about Shia Islam and Iranian culture from the perspective of the GOI. It is purportedly staffed by Shia seminary students in Qom, Iran, including ZAIDI and CHAWLA. CHAWLA was the director of Islamic Pulse at all times relevant to this affidavit.

29.     Among other things, on or about July 6, 2019, Islamic Pulse produced and published an approximately five-minute long, English-narrated video titled "Islamic Pulse Funds Yemen (Campaign)," (hereinafter the "IP Yemen Video"). The video was uploaded to Islamic Pulse's YouTube page around the same time.

30.     The IP Yemen Video implores viewers to give khums or donations to Islamic Pulse's representatives, purportedly to help victims of the Yemeni civil war. The video claims that the campaign has collected close to $90,000 and that donations were coming from multiple countries, including the United States, and transiting Iran *en route* to Yemen. The video further states that the campaign has received permission to collect khums on behalf of the Supreme Leader

9

of Iran, Ayatollah Sistani, and a third ayatollah. It depicts a letter written in Farsi authorizing the campaign to collect khums. Finally, the video instructs viewers to send an email to EMAIL ACCOUNT 1 with the following information: 1) name; 2) city of residence; 3) state/province; 4) country; 5) amount; 6) donation or khums; and 7) name of marja, if the money was for khums. And, it explains that the campaign "will try our best to arrange a pickup of these funds through one of our representatives in your vicinity." The Islamic Pulse YouTube page hosting the video also contained the hashtag, "#IPfundsYemen."

## DETAILS OF PROBABLE CAUSE

### ZAIDI's Connections to the GOI

A. ZAIDI OFFERS HIS SERVICES TO THE GOI

31.    According to a court-authorized search of ZAIDI's Yahoo email account, on or about July 28, 2015, less than a year after he moved to Iran and began attending Al-Mustafa International University, ZAIDI emailed the email address for the Supreme Leader of Iran's website and stated that he was living in Qom, Iran, and wanted to serve and strengthen the Islamic movement. ZAIDI described himself as an American who had achieved a bachelor's degree in political science and a master's degree in "Homeland and International Community." He further wrote that he believed he could serve the "Islamic Republic in the socio-political arena or in another field," and asked for guidance from the Supreme Leader of Iran on how to best serve Islam. The message was signed, "Muzzamil Zaidi."

B. ZAIDI's Access to GOI Facilities and Officials in Syria in 2018

32.    As detailed below, in 2018, ZAIDI traveled to Syria and, while there, traveled in an armed GOI military or intelligence airplane and otherwise had access that implies a close

connection with the GOI and the IRGC, a branch of Iran's armed forces that includes a counterintelligence directorate and a representative of the Supreme Leader of Iran.

33.     Based on information obtained through a court-authorized search of ZAIDI's Gmail account,[4] as well as information provided by ZAIDI's email providers, ZAIDI traveled from Iran to Syria in or around June 2018. As explained below, ZAIDI appears to have written and saved in his Gmail account a detailed account of this trip. According to Google and Yahoo! records, between on or about June 1, 2018, and on or about June 14, 2018, ZAIDI's Gmail and Yahoo! email accounts were accessed by IP addresses that resolved to Syria.

34.     According to a court-authorized search of ZAIDI's Gmail account, on or about July 9, 2018, ZAIDI sent an email with an attached document entitled "Syria journal2.docx," which contained a written account of his travel to Syria ("ZAIDI's Syria Journal"). The document was written in the first person and in English. Based on the content of ZAIDI's Syria Journal and the fact that he sent it from his Gmail account, I believe this journal is ZAIDI's firsthand account of his trip to Syria.

35.     According to ZAIDI's Syria Journal, at one point on the trip, he flew from the Damascus area to Deir Ezoor, which is located approximately 310 miles east of Damascus. ZAIDI wrote that the city saw "fierce battle at the hands of the American backed terrorists and the resistance forces."[5] ZAIDI described the aircraft he flew in to Deir Ezoor as an Iranian intelligence and/or military plane, noting,

---

[4] Google LLC (Google) records show that this account was created in 2010 and registered to "Muzzamil Zaidi" with a recovery account of the Yahoo! account referenced above.

[5] According to open-source information, there was a large-scale offensive by ISIS, and on or about June 8, 2018, ISIS managed to penetrate the city of Abu Kamal, capturing several parts of it.

> The plane itself was something that I had never experienced. Somebody once told me that Iranian intelligence is by far the poorest agency in the world but yet most effective and one could easily tell by looking at this plane. This plane barely had any chairs to sit on for these mujahideen and we were sitting on a hard bench right next to some mortar bombs.

36.     ZAIDI's Syria Journal further explained that the military/intelligence aircraft landed at some sort of an airstrip that was not an airport, where a car was waiting for ZAIDI and his group that ultimately took them to a Syrian military base under the command of an "Iranian Sipah." Based on my training and experience, I believe that "Sipah," more commonly referred to as "Sepah," is the Farsi term for the IRGC. ZAIDI's Syria Journal later describes a trip to a "Sipah Quds" base. Also based on my training and experience, I believe that "Sipah Quds" refers to the IRGC-Quds Force (IRGC-QF), which is a branch of the IRGC that conducts unconventional warfare and intelligence activities outside Iran, including assassinations and cyber-related attacks, among other things.

37.     According to ZAIDI's Syria Journal, ZAIDI and the group he was with traveled to Abu Kamal, a city in Syria. As they did so, they were advised by their "security advisors" that they were entering an active war zone and were given "Kalashankouve" (correct spelling "Kalishnikov," an automatic rifle manufacturer) to defend themselves in case of attack.

38.     Based on ZAIDI's Syria Journal, while in Syria, ZAIDI attended meetings with the Supreme Leader of Iran's representative in Damascus, Ayatollah Abolfazl Tabatabai. ZAIDI stated that "we," which he often used in the journal to refer to the group or "team" with which he was traveling, were awaiting a shipment sent to them that was to arrive at Tabatabai's office. During the trip, ZAIDI noted that he and his team had to leave their hotel due to issues of payment and were housed "at an apartment next to Agha Tabatabai's office, at the courtesy of Imam Khamenei's representative."

39.     During a court-authorized search of ZAIDI'S Google Account, the FBI identified photographs that corroborate some of the information in ZAIDI's Syria Journal. For example, the FBI recovered a photograph that shows ZAIDI and others sitting with two Middle Eastern males, who appear to be wearing similar uniforms and one of whom is holding an automatic rifle. Another photograph depicts a group of people walking away from a small plane on a remote airstrip. In yet another photograph, ZAIDI and another individual are pictured posing by the side of a road with an automatic rifle identified as a Kalishnikov AK-47. There were also multiple photographs of war-torn areas as described in ZAIDI's Syria Journal. The photographs discussed above were all transmitted between ZAIDI and other individuals between on or about June 1 and on or about June 14, 2018.

40.     Based on my training and experience and the results of this investigation, as well as discussions with other FBI agents, I believe that ZAIDI would not have been afforded the access he stated he was granted in Syria, specifically to the Supreme Leader of Iran's representative, an armed GOI military or intelligence aircraft, and at least one IRGC-QF base in an active war zone, unless he had a very close relationship to the Supreme Leader of Iran's office and/or other components within the GOI, including the IRGC.

41.     On or about June 9, 2019, ZAIDI entered the United States from Iran. During his border inspection, and he was questioned by U.S. Customs and Border Protection (CBP) officers. Regarding his trip to Syria, ZAIDI told CBP that he did not go further than approximately one hour from Damascus by car, which is contrary to the account in ZAIDI's Syria Journal. Despite what he wrote in the journal (described above) about receipt of a "Kalashankouve," as well as the pictures of ZAIDI with others who were armed in a war zone in Syria, ZAIDI did not acknowledge carrying any weapons to protect himself and stated that the area where he visited was safe. He also

denied having any interaction with foreign fighters, military, or government officials. The CBP officer noted that ZAIDI's demeanor changed when the topic of the interview shifted to Syria. For example, the officer noted that in prior portions of the interview, ZAIDI appeared relaxed and readily answered questions with no apparent difficulty. By contrast, when discussing Syria, ZAIDI was sitting on the edge of his seat with arms crossed, mumbling, and pausing frequently as if to gather his thoughts before responding. According to CBP records, he departed the United States for Iraq on or about October 16, 2019.

C. ZAIDI's Support for the Supreme Leader of Iran and Connections with GOI officials

42.   ZAIDI has been a vocal supporter of the Supreme Leader of Iran and the GOI and has acted to further these interests, including while in the United States and in addition to collecting money for the Supreme Leader of Iran. Unless stated otherwise, the following conversations were obtained via court-authorized electronic surveillance and/or physical search.

43.   On or about July 14, 2019, ZAIDI[6] had a telephone call with Person A in which Person A told ZAIDI that Person A and ZAIDI were soldiers of the Supreme Leader of Iran and Imam-e-Zaman and are working for them.[7]

44.   ZAIDI has implied to his associates that he has connections with senior officials within the GOI. For example, on or about September 26, 2019, ZAIDI told Person P that he once contacted his "other connections of the higher ups" who were able to issue the khuruji (exit stamp issued by the GOI that is required for a person to leave Iran). ZAIDI said his contacts do not ask

---

[6] ZAIDI is believed to be the person referenced in the telephone calls described below based on the results of court-authorized electronic surveillance.

[7] "Imam-e-Zaman" is likely a reference to the Twelfth Imam, mentioned above, who is believed to reside in another realm.

for money in return for help but instead ask a person to work for them. Based on my training and experience, and the results of this investigation, I believe that ZAIDI was referring to high-level GOI officials as opposed to individuals of lower status.

45.     ZAIDI has engaged in conversations where he appears to discuss GOI handlers. For example, on or about December 10, 2019, ZAIDI told NAQVI[8] that his "teacher" reached out to him. According to ZAIDI, the "teacher" said that there was a rumor circulating that ZAIDI was in Europe and asked for some proof that he was in the United States. ZAIDI further stated that he was aware of the rumor and that it involved ZAIDI collaborating with people from Europe. ZAIDI told NAQVI that the teacher cautioned him to be careful because there are Pakistanis that are working here, which I believe to be referring to the United States. ZAIDI further stated that this kind of rumor reaches the highest level and the higher-ups are looking into it. Based on my training and experience and the results of this investigation, I believe ZAIDI was referring to rumors within the GOI, and likely the IRGC, that ZAIDI was in Europe and working with Western intelligence agencies.

46.     ZAIDI has been active in his support of the GOI as recently as February 2020. On or about April 22, 2020, the Tehran Times published an article titled, "Foreign students in Qom mark anniversary of Islamic Revolution." The article described an event held in Qom, Iran, on or about February 21, 2020, that was organized by the Students of Qom (SOQ). SOQ is an umbrella group of non-Iranian seminary students and revolutionary activists living and studying in Qom. According to the article, ZAIDI emceed the event. Guests at the event were presented with a Qasem

---

[8] NAQVI is believed to be the person referenced in the telephone calls described below based on the results of court-authorized electronic surveillance

Soleimani badge and passed by posters of martyrs of the Baghdad Airport attack.[9] U.S. and Israeli flags were used as floor mats. A number of speakers spoke about the duty of Muslims to defend the Islamic Revolution and uphold the revolutionary spirit in order to stay victorious over the enemies of Islam. Special guests at the event included the Yemeni ambassador to Iran and Ayatollah Mohsen Araki, a member of the Assembly of Experts in Iran[10] and former personal representative of the Supreme Leader of Iran. Araki presented awards to "social media activists and content creators whom [CHAWLA] rightly called officers of the media war." The event ended with the audience's loud chants of death to America, death to Israel, and pledging allegiance to the Supreme Leader of Iran.

47.     A court-authorized search of ZAIDI's Gmail account occurring on or about March 30, 2020, revealed multiple images that appear to corroborate facts contained in the Tehran Times article, such as images of ZAIDI speaking from behind a podium. Other images show a mural behind the podium displaying the IRGC and Hizballah logos. This same mural appeared in the photos from the Tehran Times article. The account also contained images of Araki presenting plaques and posing with ZAIDI and others. One of those photographs depicted ZAIDI with other members of Islamic Pulse, holding a plaque and standing with Araki on stage.

## CONSPIRACY TO MOVE U.S. DOLLARS TO IRAN

48.     As detailed below, from at least in or around December 2018 and continuing to at least in or around December 2019, ZAIDI, NAQVI, and CHAWLA, and others known and

---

[9] Qasem Soleimani was the commander of the IRGC-QF. He was killed by a U.S. airstrike at the Baghdad Airport in Iraq on or about January 3, 2020.

[10] The Assembly of Experts is the deliberative body empowered to designate and dismiss the Supreme Leader of Iran. Members of the Assembly of Experts must be approved by the Supreme Leader of Iran before gaining membership.

unknown, conspired to collect money from persons residing in the United States and cause that money to be transported to Iran, in violation of IEEPA. The scheme entailed soliciting persons to contribute money and recruiting persons to take the money with them on flights from the United States to Iran and Iraq (for ultimate delivery to Iran). The individuals traveling to Iran and Iraq generally carried less than $10,000 to avoid reporting requirements and law enforcement scrutiny, and when interviewed, gave false information to CBP about the origin and intended use of the money. Unless stated otherwise, the following conversations were obtained via court-authorized electronic surveillance and/or physical search.

    A.   Islamic Pulse Core Members Obtain Authority from the GOI to Collect Khums

    49.    On or about December 5, 2018, ZAIDI made an audio recording.[11] The recording, which is primarily in English, appears intended for a group audience. In the recording, ZAIDI states that it is publicly known that he is collecting khums on behalf of the Supreme Leader of Iran. He further states that, when he receives official authorization from the Supreme Leader of Iran within the next several hours, he will send that information to the group.

    50.    ZAIDI's Google account contained a letter, hand-written in Farsi, dated December 5, 2018, giving permission to spend khums money on the people of Yemen. The letter appears to bear the signature and stamp of Ayatollah Araki (described above). The letter does not mention any person or entity by name.

    51.    ZAIDI's Google account also contained a second letter bearing the stamp of Ayatollah Araki and issued on or about February 28, 2019. The letter was from Araki, and it

---

[11] Although ZAIDI does not identify himself in this particular recording, I believe that it is his voice. First, the recording was seized from his account. Second, FBI linguists have listened to numerous recordings in which ZAIDI does identify himself. These linguists were asked to listen to this recording and advised me that they believe this recording is of ZAIDI's voice.

declared that, based on religious permissions by the Supreme Leader of Iran and Ayatollah Sistani,[12] and referring to a letter by Araki on December 5, 2018, that it is permissible to spend half of the khums money on the people of Yemen. Based on my training and experience, I believe that the other fifty percent would remain in the marja's office for use as he sees fit. The letter does not mention any person or entity by name.

52.     Based on my review of returns from a search warrant executed on EMAIL ACCOUNT 1,[13] it appears that the authority to collect khums extended to the core members of Islamic Pulse generally. For example, users of that email account listed the core members of Islamic Pulse, which included ZAIDI and CHAWLA, as working together to collect and distribute the khums money in accordance with the letters described above.

B.     Knowledge of U.S. Sanctions on Iran

53.     Based on court-authorized electronic surveillance, starting at least in or around March 2019, ZAIDI was researching how to transfer money from the United States to Iran. On or about March 4, 2019, ZAIDI searched online for "is carrying money from america to iran for an american citizen illegal." On or about the same day, he visited a publicly available online travel forum on the topic of "U.S. Customs Restrictions for Americans Visiting Iran."

54.     On June 24, 2019, the President issued Executive Order No. 13,875 imposing additional sanctions on the Supreme Leader of Iran and his office. Among other things, the sanctions prohibit the provision of funds to, or for the benefit of, the Supreme Leader of Iran and his office.

---

[12] ZAIDI also has obtained authority to collect khums on behalf of Ayatollah Sistani, who is located in Iraq, but has an office in Qom, Iran.

[13] As noted above, EMAIL ACCOUNT 1 was provided during the IP Yemen Video as a way of contacting Islamic Pulse and donating money to the Campaign.

55.     Unless stated otherwise, the following conversations were obtained via court-authorized electronic surveillance and/or physical search. On or about that same day, ZAIDI asked NAQVI whether NAQVI had read the news he had sent. After NAQVI replied that he had read it that morning, ZAIDI stated, "Hmm. This is a straight hit on khums… on the Rahbar [Supreme Leader]. [Pause] It is a hit on khums."

56.     On or about the next day, June 25, 2019, ZAIDI asked Person C whether he had heard about the sanctions placed on "our father." ZAIDI further told Person C that they should seek legal advice[14] from someone because if the khums are being collected in "the name of that person," referring to "father," then anything that has to do with him would be flagged. Based on my knowledge and experience, including the timing of the statement relative to the imposition of the sanctions, I believe that ZAIDI was referring to the Supreme Leader of Iran as "father."

57.     On or about July 7, 2019, ZAIDI searched Google for "ofac countries" and then visited the U.S. Treasury Department's publicly available website that provides information about OFAC and its sanctions programs, including sanctions against Iran and the Supreme Leader of Iran.

C.  IP Funds Yemen Video

58.     Unless stated otherwise, the following conversations were obtained via court-authorized electronic surveillance and/or physical search. ZAIDI participated in the development of a video script supporting the Islamic Pulse's purported Yemen campaign (the IP Yemen Video, described above). On or about June 1, 2019, ZAIDI received an email captioned "IP Yemen Video" that attached a transcript for a video about an effort to collect Khums on behalf of the Supreme

---

[14] Based on my review of the evidence developed to date, I am not aware of whether ZAIDI or Person A sought legal advice or not.

Leader of Iran and Sistani, purportedly to provide humanitarian aid to starving children in Yemen. The email sought ZAIDI's input, stating "the length of the script may be too long . . . I'll leave the editing to you." The email further stated "if you want me to remove something/add something then let me know."

59.     The transcript attached to the June 1, 2019 email outlined a campaign to collect funds to send to Yemen, purportedly to help the victims of war. According to the transcript: (1) the campaign had collected close to $90,000 and more than $60,000 had already been dispatched; (2) the money was donated from the United Kingdom, Iran, Pakistan, Canada, America, Australia, and Ireland; and (3) the campaign had been given authorization to collect khums from the Supreme Leader of Iran, Sistani and a third Ayatollah. The transcript called on the "spirit of Karbala" to oppose the "monstrous, ruthless, blood sucking Saudi-US-UK coalition." As noted above, the Iranian regime has generally supported the Houthi militants in Yemen, while Saudi Arabia has been supporting the Yemeni government.

60.     As discussed above, on or about July 6, 2019, the IP Yemen Video was uploaded to YouTube. The substance of the video substantially conformed to the transcript that was emailed to ZAIDI for editing on or about June 1, 2019. The video appears to have been professionally produced, and it contains multiple images that purport to show starving Yemeni children. The video's narrator states that money has been collected from multiple countries, including the United States. At the same time, the video shows an animation depicting cash flow from the United States and other countries to Iran, and then on to Yemen. When the narrator describes the Islamic Pulse team, the camera pans the room, and it depicts an individual who looks like known photographs of CHAWLA.

61.     According to information provided by Google, the recovery email address for the account used to upload the IP Yemen Video to YouTube was CHAWLA's Gmail account,[15] and the recovery phone number was an Iranian cell phone number that has been attributed to CHAWLA in search-warrant returns related to EMAIL ACCOUNT 1.

62.     The FBI has recovered two different spreadsheets used to track khums and donations to the Yemen campaign, one from a search of CHAWLA's Google Drive account and the other from a search of EMAIL ACCOUNT 1's Google Drive account. Based on these spreadsheets, Islamic Pulse's "Core Team" included CHAWLA and ZAIDI. NAQVI was listed as having given khums in the name of Khamenei to ZAIDI. According to a court-authorized search of his Google account, ZAIDI was given access to both spreadsheets. According to information provided by Google in response to a search warrant for EMAIL ACCOUNT 1's Google Drive, CHAWLA's Google account made multiple edits to the spreadsheet associated with EMAIL ACCOUNT 1's Google Drive.

63.     As of on or about July 22, 2019, ZAIDI had a photograph of a hand-written list in his Google drive that had been created on or about July 10, 2019. The list appeared to be an accounting of dollar amounts and the persons who had provided money to ZAIDI. Based on my knowledge of the results of this investigation, I believe that these amounts represented amounts of money that had been given to ZAIDI for ultimate delivery to Iran. The monetary amounts totaled approximately $40,200.

D.  Islamic Pulse Campaign Responds to Donors' Concerns

---

[15] CHAWLA identified this email account as his in an interview with FBI agents in 2014.

64.     The information in this section comes from my review of search warrant returns for EMAIL ACCOUNT 1 and CHAWLA's Gmail account. My review of those emails showed that when individuals emailed EMAIL ACCOUNT 1 asking about how to pay khums or donate money and how the money would be spent in Yemen, the user(s) of EMAIL ACCOUNT 1 would: (1) refuse to give specifics over email; (2) acknowledge that IP Funds Yemen was not a registered charity and did not have a bank account; (3) seek donations in U.S. dollars and/or euros over other currencies; and (4) demonstrate knowledge that U.S. sanctions generally prohibited U.S. dollars from being used the way the campaign planned to use them. A few examples are below.

65.     Correspondence sent to EMAIL ACCOUNT 1 was often subsequently forwarded to CHAWLA's Gmail account. On those occasions, CHAWLA would generally craft a response to the inquiry and send his response back to EMAIL ACCOUNT 1. EMAIL ACCOUNT 1 would then take CHAWLA's response and send it verbatim to the sender of the original inquiry.

66.     On or about July 7, 2019, a prospective donor wrote to EMAIL ACCOUNT 1 and asked, "[I]f there is still a blockade for aid coming into yemen [sic], how is Islamic Pulse getting the aid pass by [sic]?" This email was forwarded to CHAWLA's Gmail account. CHAWLA's Gmail account replied to EMAIL ACCOUNT 1 with a suggested response. On July 9, 2019, EMAIL ACCOUNT 1 sent CHAWLA's suggested response verbatim, including, "It's not appropriate to be shared over email."

67.     On or about July 8, 2019, in response to an email from an individual who claimed to have given money to Yemen via a different organization and who wanted to know whether that individual should stop giving to that organization, CHAWLA's Gmail account suggested language to use in response to EMAIL ACCOUNT 1. On or about that same day, EMAIL ACCOUNT 1 replied to the original email using CHAWLA's suggested text verbatim, including, "Before

collecting funds, we made sure to open up the channel with legitimate and right hands in Yemen! Alhamdolillah [thanks be to Allah] our channel is completely trustworthy. Beyond this level of information, it would be inappropriate for us to communicate via email."

68.     Also on or about July 8, 2019, in response to an email from an individual who claimed to be located in Yemen and was "curious of where and who in Yemen these funds are going to," CHAWLA's Gmail account suggested language to use in response to EMAIL ACCOUNT 1. On or about the next day, EMAIL ACCOUNT 1 replied to the original email using CHAWLA's suggested text verbatim, including, "that information may not be appropriate to shared [sic] via email. Rest assured, these funds will end up in the hand of the best of Yemenis resisting the oppression. And they will distribute it appropriately."

69.     On or about July 10, 2019, a self-described representative of a charity based in Australia emailed EMAIL ACCOUNT 1 and stated that the charity had collected over $300,000 AUD that had been delivered to Yemen via a charity based in the United Kingdom. The writer asked whether Islamic Pulse was a registered charity in any country and whether it had an account in the United Kingdom. On or about July 11, 2019, CHAWLA's Gmail account sent an email with suggested language to use in a reply to EMAIL ACCOUNT 1. On or about July 13, EMAIL ACCOUNT 1 replied to the original email, using CHAWLA's suggested language verbatim, in part, "We are not a registered charity organization. That said, we can provide you with an account in the UK if you give us the breakdown of your contributions in advance."

70.     On or about July 27, 2019, CHAWLA's Gmail account sent an email to EMAIL ACCOUNT 1 containing suggested language to use in response to a prospective donor from New Zealand who had pledged 90 New Zealand dollars. On or about the next day, EMAIL ACCOUNT

1 replied, in part, using CHAWLA's suggested language verbatim, "We are using USD [U.S. dollars]."

71.     On or about September 2, 2019, in response to an inquiry from a prospective donor who claimed to be in North Carolina and asked for mailing addresses or bank account numbers to which he could send a $100 contribution, EMAIL ACCOUNT 1 replied, "Once the funds are in Qom, you can contact Br. Ali [CHAWLA] . . . please try your best to send it in USD, else we will have to convert them into USD."

72.     On or about December 9, 2019, an individual who claimed to represent a Muslim youth group in the United States emailed EMAIL ACCOUNT 1 about donating funds from a youth group fundraiser. She asked to "explain the exact procedures we would need to do in order to make our donation, including how we would get that money to you, and how you will get that money to Yemen?" On or about December 12, 2019, EMAIL ACCOUNT 1 replied, "In terms of how we route the funds to Yemen, it may not be a good idea to share that information over email. It may be sensitive information as you live in the US. . . . Still, if you desire to find out over email, we can send you some details. (not recommended)."

73.     On or about January 9, 2020, a donor wrote to EMAIL ACCOUNT 1 and stated, "I donated to one of your people for the campaign of Yemen. I hope my money went to the right people." In a later email, the writer suggested that the group open an official bank account for a campaign and noted, "Volunteers had no identity proof to validate that they are from your campaign(we [sic] cannot give money to any random person."

74.     On or about January 12, 2020, EMAIL ACCOUNT 1 account replied, "Thanks for your words of wisdom! Can you please open a bank account and send us your account details so we can pass them to random people for depositing money in it?" After the emailer replied that he

would certainly open an official bank account if he had started a campaign, EMAIL ACCOUNT 1 account replied, "I think you are either too young to understand the issue or have no clue of what is going on in the world."

### The Defendants Arrange for the Movement of Money from the United States to Iran

75.     The defendants enlisted others to transport the money collected in the United States to Iran on at least four occasions. They intentionally caused each person to carry less than $10,000 out of the United States, to avoid the requirement to file a CMIR and/or law enforcement scrutiny. Unless otherwise stated, the following conversations were obtained via court-authorized electronic surveillance and/or physical search.

76.     On or about August 9, 2019, Person E called ZAIDI to discuss money he had collected to send to ZAIDI. Person E was with Person F, who had been dispatched by ZAIDI to collect the funds. Person E informed ZAIDI that there was an issue as "all the cash he had [was] in his bank account and his ATM had a cash withdrawal limit." The cash withdrawal limit was $700. Person E acknowledged that Person F would "return next week and by that time he [Person E] [would] withdraw all of it." Person E opined that by "that time there might be more collection added to it since there were two to three donors more who were out of town and they are in his friends circle." Person E asked ZAIDI if he was fine with that plan, and ZAIDI said he was.

77.     According to information provided by a U.S.-based company that allows people to send funds to each other electronically, Person E's statement contained at least three entries on or about August 2, 2019, August 10, 2019, and August 17, 2019, identified as "Islamic Pulse funds Yemen," "Yemen," and "Yemen funds." Moreover, according to Person E's bank account records, on or about August 9, 2019, an ATM withdrawal of $700 was made from the account. This withdrawal is consistent with the aforementioned conversation Person E had with ZAIDI that same

day. Approximately eight days later, on or about August 15, 2019, Person E's bank records show a teller cash withdrawal of $4,900.

### A. Person D's Travel to Iran

78.     On or about August 13, 2019, ZAIDI told NAQVI that Person D[16] wanted to see him as he was leaving in a day or two. ZAIDI asked NAQVI to find out how much money they want to send through Person D and to call ZAIDI back right away.

79.     On or about August 21, 2019, ZAIDI spoke to Person D. ZAIDI asked Person D how much he could take to Iran. Person D replied that he was taking $3,000 of his own money. ZAIDI said he would give Person D "six and a half" [$6,500] to take, which Person D agreed to do. The total amount Person D was to carry was thus $9,500, which is under the $10,000 threshold for a CMIR report. ZAIDI also offered to have a contact in Iran give Person D a tour of the Islamic Pulse studios, which I believe, based on my training and experience, are located in Qom, Iran.

80.     CBP records show that Person D left the United States on or about August 23, 2019, *en route* to Iran and returned to the United States on or about September 6, 2019.

81.     On or about September 5, 2019, Person G told ZAIDI that he had to give ZAIDI khums in the amount of "$6,200." Person G then said that "[Person D's first name]" had just traveled "there," which I believe refers to Person D's travel to Iran on or about August 23, 2019. ZAIDI told Person G that he had sent Person D "fully packed," which I believe is a reference to Person D's carrying just less than the $10,000 reporting requirement for ZAIDI. ZAIDI further

---

[16]     On or about August 13, 2019, ZAIDI only used Person D's first name. Other evidence, including court-authorized electronic surveillance and CBP records, shows that ZAIDI was referring to Person D.

told Person G that it is not just Person G's money that needed to be sent, which I believe is a reference to ZAIDI's collection of khums from others in the United States.

A.  ZAIDI Relatives Travel to Iran with Cash Structured to Avoid Reporting Requirement

82.     In or around September 2019, several relatives of ZAIDI traveled to Iran from the United States, carrying with them U.S. currency structured to avoid reporting requirements. Some of this money may have been intended to purchase property in Iran for a planned move. However, during CBP questioning after one of these relatives returned to the United States, this relative (Person H) admitted that ZAIDI and others collect money from various individuals (in the United States) and send it in increments of under $10,000 for ultimate delivery to Iran and elsewhere.

83.     According to CBP records, Person H and Person I (another relative of ZAIDI's) left the United States for Iran on or about September 5, 2019, with cash totaling $6,578 and $6,582, respectively. CBP questioned both Person H and Person I, and they claimed that the money was personal. Person I told CBP that ZAIDI had given her the money for expenses during her stay in Iran. Person H claimed that Person G had given her the money to cover her expenses while traveling in Pakistan.

84.     Person H returned to the United States on or about October 29, 2019. Person H initially told CBP that, contrary to her prior statement to CBP, she had left the United States with $1,000 to $1,500 of her own money. Almost immediately, she remembered that ZAIDI had given $13,160 to Person I, who then divided the amount, giving Person H $6,578 to carry with her when she left the United States. When asked what she did with the money in Iran, Person H appeared confused and had difficulty responding. Eventually, she stated that she returned the money to Person I, who handed the money to ZAIDI. Person H further stated Person I did not carry the entire sum because she knew that the limit was $10,000 per person. Person H also explained that the

money came from friends, associates, and family who trusted ZAIDI with the money to distribute to needy people and people in poverty. When asked where the money would go, she replied that she had overheard ZAIDI and his brothers discussing the money going to Yemen, Iran, and other countries.

85.     Person H further told CBP that each time money was taken out of the United States it was in increments of $8,000 to $10,000. As noted above, when questioned while leaving the United States, Person H originally told CBP that Person G had provided her money to cover her expenses traveling to Pakistan. However, upon her return to the United States, Person H admitted that the entire amount was provided by ZAIDI and split between herself and Person I to evade reporting requirements.

86.     Person H also told CBP officers that Person J and ZAIDI, both of whom primarily reside in Iran, had different people who took money out of the United States for them, but Person H could not provide names. She stated that ZAIDI collected money in the United States, Pakistan, Iraq, and Iran.

B.   Person B's Travel to Iran with Money for ZAIDI

87.     On or about September 26, 2019, Person B told ZAIDI that he was traveling to Iran on or about October 9, 2019, and from there to Iraq on or about October 11, 2019. ZAIDI asked Person B if he could carry money for him, and Person B said he could take up to $5,000.

88.     According to CBP records, on or about October 9, 2019, Person B traveled from the Washington, D.C. area to Iran. Person B was questioned by CBP. During the interview, Person B stated that he was carrying $3,000 of his own money and $5,000 for someone else; CBP verified that the actual amounts were $3,000 and $4,000. Person B claimed that his brother-in-law gave

him the money to give to a person in Iran for an unknown purpose. Person B appeared visibly nervous throughout the exchange.

C.  Sending Money to Iran Through Individuals Traveling to Iraq for Religious Pilgrimage

1.  Operational Planning for Group Trip to Iraq

89.    According to open-source information, Arba'een is an Islamic religious pilgrimage that takes place yearly in Karbala, Iraq. In 2019, Arba'een took place in late October. Unless stated otherwise, the following conversations were obtained via court-authorized electronic surveillance and/or physical search.

90.    On or about September 24, 2019, ZAIDI asked Person K whether he had spoken to people about bringing money as there would be people coming [to Iran] from Iraq and they would be able to take money with them. ZAIDI clarified that people were going to Iran from Arba'een (in Iraq). Based on my training and experience, and in the context of this investigation, I believe that ZAIDI and Person K planned to arrange for individuals to transport money to Iraq and then for others to transport the money from Iraq to Iran. ZAIDI further stated that his trip was being sponsored by someone who had asked him not to disclose to anyone who the sponsor was.

91.    On or about September 26, 2019, ZAIDI told an associate that he had extensively searched for a ticket and the cheapest option was to go from "here [Houston] to Baghdad [Iraq] and then from Baghdad to Tehran [Iran] by vehicle, since some people will be returning [to Tehran]." As discussed below, ZAIDI traveled to Iraq on or about October 16, 2019, and returned to the United States from Iran on or about October 27, 2019

92.     On or about September 29, 2019, ZAIDI asked Person K for an update on sending things from there.[17] Person K told ZAIDI that there were three people here who could take money and that he would speak with another individual. Person K stated that he had spoken to one of the three who would take "8" [$8,000] but had not spoken to the other two. ZAIDI asked him to do so because he needed to plan. Person K replied that he would let ZAIDI know the details by tomorrow. ZAIDI told Person K that there was someone who could take "5" [$5,000].

93.     On or about September 30, 2019, Person K told ZAIDI that he had found another person who could carry "eight and a half" [$8,500].

94.      On or about October 2, 2019, Person K told ZAIDI that he had given "it" to one party and would give it to the other three parties later. Person K told ZAIDI that he had spoken with another party, and he would send it through. Person K told ZAIDI that he could take it on his own. They next discussed the number of travelers, and ZAIDI told Person K that 25 people were coming. Person K asked ZAIDI when they were coming. ZAIDI replied that they would come between the five days before the start of Arba'een to two days after the start of Arba'een.[18]

95.     Person G knew about ZAIDI's collection and transmittal of khums money from the United States and assisted in the endeavor. For example, on or about October 9, 2019, Person G told ZAIDI that an individual was "willing to carry 5" [$5,000] . Person G asked ZAIDI if he could come over then they could both go and withdraw the money. ZAIDI told Person G that he was going to the airport to drop someone off to depart for Iraq and that they should send "5" [$5,000]

---

[17] Since PERSON K flew to Arba'een in Iraq from O'Hare International Airport, I believe that ZAIDI was asking for an update on sending money from Chicago.

[18] According to open sources, in 2019, Arba'een began on the evening of October 19, 2019. The dates of travel based on this information would suggest the majority of the travelers would be leaving between the third and fourth weeks of October 2019.

with this person. Person G told ZAIDI to come and take "it" from him and give it to whomever he needs. ZAIDI replied that he would come and get it.

96.     On or about October 10, 2019, Person G asked ZAIDI if he (Person G) should pay more than $5,000 in khums he owed locally or give it to ZAIDI. ZAIDI replied that Person G should give it to him. Person G said that he would withdraw and bring the money tomorrow. Based on the results of the FBI's investigation, I believe that Person G was asking ZAIDI if the money should be used locally, for example, in the Houston area, or taken back to Iran with ZAIDI.

97.     On or about October 10, 2019, ZAIDI and Person G discussed ZAIDI's taking money for Person G. Person G told ZAIDI he had "8" [$8,000]. ZAIDI asked Person G how much he was taking with him. Person G replied that he was taking "10" [$10,000]. ZAIDI asked why he is taking that and for whom. Person G said that he would give it to the group when he got there. ZAIDI advised Person G to give them the money here, which would work better.

98.     On or about October 10, 2019, CBP conducted an outbound inspection of Person G at George Bush Intercontinental Airport in Houston, Texas. Person G completed an involuntary CMIR and declared $11,039 in cash.[19] Despite what he had told ZAIDI earlier that same day, Person G informed CBP that he withdrew the funds from his account the day before and that he was not carrying any money on behalf of anyone else.

99.     On or about October 11, 2019, Person G asked ZAIDI if anyone was leaving the next day and, if so, who. ZAIDI informed Person G that the "youngsters" were set to leave the day after tomorrow. Based on my knowledge of the results of this investigation, the "youngsters" refers

_____

[19] PERSON P was originally carrying $10,000 on his person, with his wife carrying the rest. When CBP informed him that they were considered the same household, he said that all the money was his and filled out the form.

to the group of couriers who agreed to carry money from the United States to Iraq (with ultimate delivery to Iran) for ZAIDI (discussed above).

    2.   Group Travel to Iraq with Money for ZAIDI

100.    On or about October 12, 2019, ZAIDI asked an individual identified as Person L to take "$7,000" to Iraq for ZAIDI. Person L agreed and further informed ZAIDI that "[Person M's first name]" would be traveling on the same flight. Your affiant believes that ZAIDI was referring to Person M, below.

101.    Based on CBP records, as well as other evidence developed in this investigation, on or about October 12, 2019, a group of approximately 25 individuals traveled from Houston to Iraq for the Arba'een pilgrimage. Person N was part of the group. On October 13, 2019, Person L and Person M also traveled from Houston to Iraq for Arba'een. CBP questioned each of these three individuals. During Person N's interview, he stated that he was traveling with $4,000; CBP verified the amount. During Person L's interview, he stated that he was traveling with about $7,900 and that the money was his and he was not carrying any money for anybody else; CBP verified the amount. During Person M's interview, he stated that he was traveling with $7,000 and that the money was his and that no one had given him any of the money; CBP verified the amount. When Person M returned, he claimed he had left with $6,000.

102.    On or about October 13, 2019, NAQVI asked ZAIDI if all of "our youngsters" had left yesterday and arrived safely in Turkey.[20] NAQVI asked if a security check had been performed "here" on the "youngsters." ZAIDI said it had not been confirmed yet but that he had asked an individual to send a good bye message when they had passed through security and had reached Turkey. ZAIDI said that 36 of them were traveling and that he was very stressed about it.

---

[20] According to CBP records, some of these individuals transited Istanbul *en route* to Iraq.

103.    On or about October 13, 2019, ZAIDI told NAQVI that he had spoken to an individual who said that the youngsters traveling with money, and one or two in addition to them, had been pulled to the side. NAQVI said the passengers were going everywhere and not everyone was traveling to Iran. ZAIDI said the youngsters were picked out of the group and they were carrying money. ZAIDI said he was trying to confirm with one of the travelers.

104.    On or about October 13, 2019, NAQVI asked ZAIDI if he had given anything to Person O, to which ZAIDI said no. NAQVI reported that one of the travelers was able to "skim through" [was not pulled aside by customs] and nothing happened. ZAIDI commented that "we are not taking it seriously." NAQVI said based on this situation they had to separate those students. ZAIDI reported that he had just spoken to a different traveler who had not disclosed much. ZAIDI said that they would discuss this issue as it was genuine; NAQVI agreed. ZAIDI said that this other traveler reported that they had been "asked to step aside when they were boarding and it was just them not everyone." ZAIDI said that he would get more details when he got there and would meet with them. NAQVI said that they focused on one aspect while there were so many of them.

105.    On or about October 13, 2019, ZAIDI told NAQVI that "they" took pictures of "the currency." He further stated that "he does not want to say that it is nothing." NAQVI responded that "it cannot be ignored but it cannot also be blown out of proportion." Based on my training and experience, and in the context of this investigation, I believe that ZAIDI and NAQVI were discussing CBP's secondary inspections of Person L, Person M, and Person N, and others and were surmising that it was possible that law enforcement had learned about ZAIDI's scheme.

106.    During the same conversation, ZAIDI stated that he "hates accounting and calculations" and that "he spent two to three hours figuring things out." Additionally, he told NAQVI that "he thought he had sent 49 but had actually given 45." Based on my training and

experience, and in the context of this investigation, I believe ZAIDI was explaining to NAQVI that he had sent $45,000 to Iran with the group who had traveled to Iraq for Arba'een.

107.    On or about October 14, 2019, ZAIDI and NAQVI discussed what would happen when the group returned from Iraq. NAQVI said that they would have "terrible diarrhea" and told ZAIDI to "just make sure no one shits." Based on my training and experience and knowledge of this investigation, I believe that ZAIDI and NAQVI were discussing the likelihood that the group of travelers to Iraq who had taken money intended for Iran would be questioned by CBP on their return and NAQVI's hope that none of them would talk to authorities about what they had done. ZAIDI told NAQVI that it had happened to Person K as well. ZAIDI said that when Person K had left he had sent ZAIDI a message saying that it was "quite hot" when he left the United States. In the context of this investigation, I believe that "quite hot" refers to the questioning Person K received leaving the country.

108.    According to CBP records, on or about October 16, 2019, ZAIDI traveled from the United States to Iraq and returned to the United States from Iran on or about October 27, 2019.

109.    On or about October 28, 2019, ZAIDI called Person L and, while laughing, asked if Person L had returned. Person L responded that "they have to suffer so much because of him." ZAIDI asked Person L if he had been pulled aside at the airport on his way back. Person L responded that he would call ZAIDI from a different number.

110.    On the same day that ZAIDI spoke with Person L, ZAIDI spoke to Person P, who said he invited all of the "youngsters" for breakfast. ZAIDI asked Person P how the guys were doing since he heard all of them had received a "grandeur" protocol on their return. Person P said yes and asked if ZAIDI also had received the protocol to which ZAIDI said it was extensive. Based

34

on my training and experience and the context of this and other conversations, I believe ZAIDI and Person P were discussing CBP secondary inspections and questioning.

111.    Also on or about October 28, 2019, ZAIDI contacted Person G regarding Person G's secondary inspection at the airport the night before. Person G said it was the same officer who had questioned him before; he said the officer asked about the trip, locations visited, persons met, if someone had given Person G anything, and if anyone had asked Person G to lie to border officials/law enforcement if encountered. ZAIDI chuckled after Person G shared this information. ZAIDI asked Person G if the officer had asked about any special person in particular to which Person G replied no. ZAIDI told Person G that he had received intense scrutiny at the airport when he was taken aside.

112.    During a Court-authorized search of ZAIDI's Google Account, the FBI found an audio recording dated on or about October 22, 2019. In that recording, ZAIDI was asked by an unidentified individual "if it is confirmed that people from Iran are going to Iraq." This individual stated that he had heard that those people are unable to obtain visas and that "he wants to confirm because he is about to send the money with someone." This individual further stated that "if people are coming to [Arba'een, the pilgrimage in Iraq] [then] he can give it to them there." Based on my training and experience, and in the context of this investigation, I believe that ZAIDI and the individual were discussing how to move money from Iraq to Iran.

### ZAIDI's s Use of Operational Security and Tradecraft

113.    On or about September 25, 2019, ZAIDI told Person Q that a particular bank location did not check identification. ZAIDI said he was thinking of making this bank the regular procedure. ZAIDI recalled that the last time he had used this bank they did not ask for any identification so no one could tell who deposited the money.

114.    On or about October 16, 2019, before ZAIDI left the United States for Iraq, NAQVI instructed him to "fix and clean his device" to which ZAIDI agreed. Based on my training and experience, I believe that NAQVI's instructions to "fix and clean his device" refer to ZAIDI's wiping his mobile phone of evidence of their activity before going through security screening at the airport.

115.    On or about December 3, 2019, ZAIDI told an associate that he was leaving for Iran on December 22, 2019, and the two engaged in a discussion about security searches and interviews at the airport. ZAIDI stated that he had purchased the phone he had with him in the United States and that he would never bring a phone he had in Iran to the United States. The associate to whom ZAIDI was speaking advised him to delete an encrypted messaging application from his phone.

116.    On or about June 24, 2020, ZAIDI told NAQVI that ZAIDI could not openly tell another associate why ZAIDI was in the United States. ZAIDI further said he had just returned from a meeting and was extremely exhausted from it.

117.    On or about July 5, 2020, ZAIDI told Person Q that he had stopped another associate from discussing something over an encrypted messaging application because he figured it was something dangerous. ZAIDI then asked Person Q to set up a meeting with this associate so that they could discuss the issue in person.

118.    On or about July 14, 2020, ZAIDI asked an associate for his address, which he had asked for previously. When asked why he needed the address again, ZAIDI responded that he had been told "by the people not to enter their address in the GPS." ZAIDI clarified it was not him, but the "people" who said that.

119.     According to a check of records maintained by OFAC on [July 31, 2020], at no time did ZAIDI, NAQVI, or CHAWLA apply for a license from OFAC, which is located in the District of Columbia, to supply services, directly or indirectly, to Iran, the GOI, or the Supreme Leader of Iran.

120.     According to a check of records maintained by the Foreign Agents Registration Act unit at the Department of Justice on [July 31, 2020], at no time did ZAIDI notify the Attorney General, whose office in the Department of Justice is located in the District of Columbia, that he would be acting as an agent of the government of Iran within the United States.

## **CONCLUSION**

121.     Based on my training and experience, and in light of all the information described herein, I believe ZAIDI is acting as an agent of the GOI and is collecting money in the United States and sending that money to Iran on behalf of the GOI and the Supreme Leader of Iran. ZAIDI is one of a team who has authority to collect money in the United for and on behalf of the Supreme Leader and who is loyal to the GOI and the Supreme Leader of Iran. Based on my training and experience, ZAIDI's travel to Syria, and his access to IRGC bases, aircraft, and the Supreme Leader's representative in Syria are consistent with someone working for or on behalf of the GOI, IRGC, and the Supreme Leader of Iran and/or his office.

122.     In addition, based on my training and experience, and on the operational security I have seen him employ, I believe that ZAIDI has received some training from the GOI and/or IRGC regarding his activities in the United States. ZAIDI prefers to hold conversations in person and believes doing so over the phone, even via an encrypted app, could be dangerous. ZAIDI communicates in coded language with others involved in collecting funds and arranging for the transmission of funds to Iran. ZAIDI also avoids telling some friends the real reason he is in the

United States. Lastly, I have observed him conducting a possible surveillance detection route. Based on my training and experience, ZAIDI's behavior is consistent with having received training from a foreign government or foreign intelligence service, such as the GOI and/or the IRGC.

123.    I further believe that NAQVI, CHAWLA, and others known and unknown have conspired with ZAIDI to collect U.S. dollars and then cause that money to be transported to Iran, without having first obtained a license from OFAC.

124.    Based on the foregoing allegations, I submit that there is probable cause to believe that MUZZAMIL ZAIDI, ASIM NAQVI, and ALI CHAWLA, and others known and unknown have conspired to provide services to Iran and the GOI, by collecting money in the United States on behalf of the Supreme Leader of the Islamic Republic of Iran, the Ayatollah Ali Husseini Khamenei, a Specially Designated National, and causing the money to be transported to Iran, without having first obtained a license from OFAC, as required by law, in violation of 50 U.S.C. §§ 1701-1705. I further submit there is probable cause to believe that MUZZAMIL ZAIDI has

knowingly acted as an agent of a foreign government, namely, the government of Iran, in the United States, without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951.


Joseph W. Ferrell
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 17th day of August, 2020.


G. MICHAEL HARVEY
United States Magistrate Judge