IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in December 6, 2019

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| MUZZAMIL HUSNAIN ZAIDI, | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| ASIM MUJTABA NAQVI, and | : | |
| | : | 18 U.S.C. § 951 |
| ALI CHAWLA, | : | (Acting as an Illegal Agent of |
| also known as "Ali Ali," | : | a Foreign Government) |
| | : | |
| Defendants. | : | 50 U.S.C. §§ 1701-1706 |
| | : | (International Emergency Economic |
| | : | Powers Act) |
| | : | |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions and Sanctions |
| | : | Regulations) |
| | : | |
| | : | Exec. Order No. 13,876 |
| | : | (Imposing Sanctions with Respect to |
| | : | Iran) |
| | : | |
| | : | 18 U.S.C. § 1956(h) |
| | : | (Conspiring to Engage in International |
| | : | Money Laundering) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |
| | : | |
| | : | FORFEITURE |
| | : | |
| | : | 18 U.S.C. §§ 982(a)(1) & (b)(1); |
| | : | 21 U.S.C. § 853(p); and |
| | : | 28 U.S.C. § 2461(c) |
| | : | |

**<u>INDICTMENT</u>**

The Grand Jury charges that:

## COUNT ONE

At all times material to this Indictment:

1. Defendant Muzzamil Husnain Zaidi (ZAIDI) was born in 1984 in Pakistan and became a naturalized U.S. citizen on or about January 20, 2005. Though he resided primarily in Qom, Iran, ZAIDI entered the United States in or around April 2019 and was in the United States intermittently through in or around December 2019. On or about June 12, 2020, he again entered the United States, where he remained through the date of this Indictment. ZAIDI was a core member of a group that operated Islamic Pulse (described below). He attended Al Mustafa University, also known as Al-Mustafa International University (hereinafter, Al-Mustafa University), which was founded in its current form in 2007 under the direction of the Supreme Leader of Iran.

2. Defendant Asim Mujtaba Naqvi (NAQVI) was born in 1984 in Karachi, Pakistan, and became a naturalized U.S. citizen on or about February 3, 2010. He resided in the Houston, Texas area.

3. Defendant Ali Chawla, also known as "Ali Ali" (CHAWLA), was born in 1984 in Pakistan and resided in Qom, Iran. CHAWLA was the director of Islamic Pulse and was affiliated with Al-Mustafa University.

4. Khums, which means "one-fifth" in Arabic, was a religious tax imposed as a jurisprudential tenet of Islam. Within Shia Islam, the dominant branch of Islam within Iran, individuals were required to pay twenty percent of their unused annual income to the Imam, the head of the Islamic State, through his marji (singular: marja).

5. Ayatollah Ali Husseini Khamenei, the Supreme Leader of the Islamic Republic of Iran (hereinafter, the Supreme Leader of Iran), was recognized as the head of the Islamic State and,

2

as a marja, was authorized to collect khums on behalf of the Imam. Starting in 1995, the United States imposed economic sanctions on the government of Iran (GOI). Beginning on or about June 24, 2019, the United States imposed additional economic sanctions specifically on the Supreme Leader of Iran.

6.      Ayatollah Sayyid Ali al-Husayni al-Sistani (Sistani) was another prominent Iranian marja who was authorized to collect khums on behalf of the Imam. Sistani resided in Iraq and maintained an office in Qom, Iran.

7.      Khums were paid to the Supreme Leader of Iran, Sistani, and other marji, through their designated representatives. Each marja's representatives were authorized in writing to collect khums on the marja's behalf. The Supreme Leader of Iran determined how khums given in his name were used in Iran and/or within the GOI; he (or his office) also provided official receipts to his representatives, who were then responsible for providing those receipts to the persons who had paid khums.

8.      Islamic Pulse was a publicly available, multimedia website that hosted images, videos, and articles about Shia Islam and Iranian culture from the perspective of the GOI. Shia seminary students in Qom, Iran, including ZAIDI and CHAWLA, staffed Islamic Pulse. On or about July 6, 2019, Islamic Pulse published an approximately five-minute long, English-narrated video titled "Islamic Pulse Funds Yemen (Campaign)" (hereinafter, the IP Yemen Video). The IP Yemen Video implored viewers to give khums or donations to Islamic Pulse's representatives, for its Yemen campaign, purportedly to help victims of the Yemeni civil war (hereinafter, the Yemen Campaign). The video claimed that the Yemen Campaign had collected close to $90,000 and that donations had come from multiple countries, including the United States, and transited Iran *en route* to Yemen. The video further stated that the Yemen Campaign had received permission to

collect khums on behalf of the Supreme Leader of Iran, Sistani, and a third ayatollah. The video instructed viewers to send an email to an identified email account associated with Islamic Pulse if they wished to donate or contribute khums to the Yemen Campaign.

### The United States Sanctions Against Iran

9.      The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, granted the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. Pursuant to that authority, the President could declare a national emergency through Executive Orders that had the full force and effect of law. Among other things, IEEPA empowered the President to impose economic sanctions on a foreign country.

10.     On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the GOI constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. *See* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

11.     To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), which was located in Washington, D.C., promulgated the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560.

12.     Absent permission from OFAC in the form of a license, the ITSR prohibited, among other things, the export, reexport, or supply, directly or indirectly, from the United States, or by a

U.S. person, wherever located, of any goods or services, including financial services, to Iran or the GOI. 31 C.F.R. § 560.204. This prohibition applied to (1) the transfer of funds, directly or indirectly, from the United States or by a U.S. person, wherever located, to Iran or the GOI, and (2) the provision of money remittance services, directly or indirectly, to Iran or the GOI. 31 C.F.R. § 560.427.

13. The term "government of Iran," as used in the ITSR, included, among other things, the state and government of Iran, as well as any political subdivision, agency, or instrumentality thereof; and any person to the extent that such person is, or has been, acting or purporting to act, directly or indirectly, for or on behalf of the foregoing. 31 C.F.R. § 560.304.

14. On June 24, 2019, pursuant to IEEPA, the President issued Executive Order 13,876, imposing additional sanctions on the Supreme Leader of Iran and the Supreme Leader's Office. Exec. Order No. 13,876; 84 Fed. Reg. 30,573 (Jun. 26, 2019). The President imposed these sanctions in response to "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East [and] promote international terrorism." Executive Order 13,876 prohibited, by a United States person or with respect to property in the United States, the making of any contribution or provision of funds, goods, or services, by, to, or for the benefit of, any person, including the Supreme Leader of Iran, whose property and interests in property were blocked pursuant to the order.

15. While the ITSR authorized the transfer of funds involving noncommercial, personal remittance to Iran, or for or on behalf of an individual in Iran, they prohibited such transfers to, by, or through the GOI. 31 C.F.R. § 560.550(a). Executive Order 13,876 further prohibited transfers by, to, or for the benefit of the Supreme Leader of Iran.

5

16.     The ITSR, specifically 31 C.F.R. § 560.203, and Executive Order 13,876 further prohibited any transaction by any U.S. person or within the United States that evaded, avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate, any of the prohibitions contained in the ITSR and Executive Order 13,876.

17.     Under IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued by statute, including the ITSR and Executive Order 13,876. 50 U.S.C. § 1705(a).

18.     "United States person" was defined to include United States citizens, U.S. permanent resident aliens, and individuals located within the United States.

19.     The ITSR and, as of June 24, 2019, Executive Order 13,876 were in effect at all times relevant to this Indictment.

### Failure to Comply with U.S. Law

20.     ZAIDI, NAQVI, and CHAWLA did not, at any time, obtain a license from OFAC, which was located in the District of Columbia, to export or reexport goods to Iran or to the Supreme Leader of Iran or to provide services to Iran or to the Supreme Leader of Iran.

### The Conspiracy

21.     Beginning as early as in or around December 2018, and continuing at least through in or around December 2019, in the District of Columbia, Iran, and elsewhere, ZAIDI, NAQVI, and CHAWLA, did knowingly and unlawfully combine, confederate, and agree together, with each other, and with other persons known and unknown to the Grand Jury, to commit offenses against the United States, to wit, Title 50, United States Code, Sections 1701-1706.

### Object of the Conspiracy

22.     It was a part of the conspiracy and an object of the conspiracy that ZAIDI, NAQVI,

and CHAWLA, and other coconspirators would and did export and reexport and attempt to export and reexport goods (that is, U.S. currency) to Iran and to the Supreme Leader of Iran and would and did provide services to Iran and to the Supreme Leader of Iran, without having first obtained the required license from OFAC, as required by law, in violation of Title 50, United States Code, Sections 1701-1706.

### Manner and Means of the Conspiracy

23. The manner and means by which the defendants and their coconspirators sought to accomplish the objects of the conspiracy included, among others, the following manner and means:

   a. Beginning as early as in or around December 2018, ZAIDI, CHAWLA, and other conspirators received permission to collect khums for and on behalf of the Supreme Leader of Iran and Sistani.

   b. ZAIDI, CHAWLA, and other conspirators would and did use social media and video-sharing Internet websites to encourage individuals to give khums and donations to Islamic Pulse's purported Yemen Campaign to send money, through Iran, allegedly to victims of Yemen's civil war.

   c. CHAWLA and other conspirators would and did use email to encourage prospective Yemen Campaign donors to give money to the members of Islamic Pulse in U.S. dollars.

   d. ZAIDI, NAQVI, and other conspirators would and did collect and track the collection of U.S. dollars within the United States.

   e. ZAIDI, NAQVI, and other conspirators would and did provide the U.S. dollars they collected to individuals who would and did travel with this money to Iran and to Iraq for ultimate delivery to Iran.

7

  f. ZAIDI, NAQVI, and other conspirators would and did cause the individuals traveling to Iran and Iraq to carry less than $10,000 to avoid U.S. financial reporting requirements and law enforcement scrutiny, and to, when interviewed, give false information to U.S. authorities about the origin and intended use of the money.

  g. CHAWLA and other conspirators would and did receive U.S. dollars collected in and exported from the United States, in Iraq and Iran, for delivery to the Supreme Leader of Iran's office in Iran and elsewhere in Iran.

### Overt Acts

24. In furtherance of the conspiracy and to effect the object thereof, defendants ZAIDI, NAQVI, and CHAWLA, and other unindicted coconspirators, whose identities are known and unknown to the grand jury, did commit the following overt acts, among others, in the District of Columbia, Iran, and elsewhere:

  a. On or about December 5, 2018, ZAIDI created an audio message, in English, stating that it was publicly known that he was collecting khums on behalf of the Supreme Leader of Iran, and, that when he received official authorization, he would disseminate that information.

  b. On or about June 24, 2019, ZAIDI and NAQVI discussed sanctions placed on the Supreme Leader of Iran by the U.S. government.

  c. On or about July 6, 2019, CHAWLA uploaded to an Internet-based video-sharing website a video that encouraged individuals to give donations and khums to the Yemen Campaign.

  d. On or about July 7, 2019, on behalf of Islamic Pulse, CHAWLA drafted,

and caused to be sent, a response to a prospective donor who asked how Islamic Pulse would get funds to Yemen. CHAWLA's response stated that the information was not appropriate to be shared over email.

e. On or about July 7, 2019, ZAIDI searched online for "ofac countries" and then visited the U.S. Treasury Department's publicly-available website that provides information about OFAC and its sanctions programs, including sanctions against Iran and the Supreme Leader of Iran.

f. On or about July 11, 2019, on behalf of Islamic Pulse, CHAWLA drafted, and caused to be sent, a response to a prospective donor who asked whether Islamic Pulse was a registered charity in any country. CHAWLA's response stated, in part, "We are not a registered charity organization."

g. On or about August 13, 2019, ZAIDI and NAQVI discussed how much money to send to Iran with Person A, who was scheduled to travel to Iran shortly thereafter.

h. On or about August 23, 2019, ZAIDI, NAQVI, and CHAWLA caused Person A to carry approximately $6,500 from the United States to Iran.

i. On or about October 9, 2019, ZAIDI, NAQVI, and CHAWLA caused Person B to carry approximately $4,000 from the United States to Iran.

j. On or about October 12, 2019, ZAIDI, NAQVI, and CHAWLA caused multiple individuals to carry a total of approximately $45,000 from the United States for ultimate delivery to Iran.

k. On or about October 13, 2019, ZAIDI and NAQVI discussed how much money, intended for ultimate delivery to Iran, they had sent with the individuals

traveling to Iraq.

l.   On or about October 14, 2019, ZAIDI and NAQVI discussed what would happen if the travelers to Iraq were questioned by U.S. authorities when the group returned to the United States.

m.   At no time did ZAIDI, NAQVI, or CHAWLA apply for a license from OFAC, which is located in the District of Columbia, to export goods or services to Iran.

(**Conspiracy,** in violation of Title 18, United States Code, Section 371)

## COUNT TWO
### (International Emergency Economic Powers Act)

25.   The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Twenty of this Indictment.

26.   On or about August 23, 2019, within the District of Columbia, Iran, and elsewhere, defendants ZAIDI and NAQVI, United States persons, and defendant CHAWLA did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706, and the Iranian Transactions and Sanctions Regulations, by exporting and reexporting goods to Iran and to the Supreme Leader of Iran and by providing services to Iran and to the Supreme Leader of Iran, by causing Person A to carry approximately $6,500 from the United States to Iran, without having first obtained the required license from the Office of Foreign Assets Control.

(**IEEPA,** in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations, Parts 560.204, 560.206; Exec. Order No. 13,876; and Title 18, United States Code, Section 2)

## COUNT THREE
**(International Emergency Economic Powers Act)**

27.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Twenty of this Indictment.

28.     On or about October 9, 2019, within the District of Columbia, Iran, and elsewhere, ZAIDI and NAQVI, United States persons, and CHAWLA did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706, and the Iranian Transactions and Sanctions Regulations, by exporting and reexporting goods to Iran and to the Supreme Leader of Iran and by providing services to Iran and to the Supreme Leader of Iran, by causing Person B to carry approximately $4,000 from the United States to Iran, without having first obtained the required license from the Office of Foreign Assets Control.

**(IEEPA,** in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations, Parts 560.204, 560.206; Exec. Order No. 13,876, 84 Fed. Reg. 30,573 (Jun. 26, 2019); and Title 18, United States Code, Section 2)

## COUNT FOUR
**(International Emergency Economic Powers Act)**

29.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Twenty of this Indictment.

30.     In or around October 2019, within the District of Columbia, Iran, and elsewhere, ZAIDI and NAQVI, United States persons, and CHAWLA, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706, and the Iranian Transactions and Sanctions Regulations, by exporting and reexporting goods to Iran and to the Supreme Leader of Iran and by providing services to Iran

and to the Supreme Leader of Iran, by causing multiple individuals to carry a total of approximately $45,000 from the United States to Iraq, for ultimately delivery to Iran, without having first obtained the required license from the Office of Foreign Assets Control.

**(IEEPA,** in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations, Parts 560.204, 560.206; Exec. Order No. 13,876, 84 Fed. Reg. 30,573 (Jun. 26, 2019); and Title 18, United States Code, Section 2)

## COUNT FIVE
### (Acting As an Illegal Agent of a Foreign Government)

31. The Grand Jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Twenty of this Indictment.

32. Beginning as early as in or around April 2019 and continuing at least through in or around December 2019, in the District of Columbia and elsewhere, defendant ZAIDI did knowingly act in the United States as an agent of a foreign government, that is, the government of Iran (GOI), without prior notification to the Attorney General, as required by law.

33. At the direction and control of the GOI, ZAIDI collected U.S. dollars in the United States and caused that money to be exported and reexported from the United States to Iran, including through Iraq.

34. At no time did ZAIDI notify the Attorney General, whose office in the Department of Justice is located in the District of Columbia, that he would be acting as an agent of the GOI within the United States.

**(Agents of Foreign Governments,** in violation of Title 18, United States Code, Section 951)

## COUNT SIX

### (Conspiring to Commit International Money Laundering)

35. The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Twenty of this Indictment.

36. Beginning as early as in or around December 2018, and continuing at least through in or around December 2019, in the District of Columbia, Iran, and elsewhere, ZAIDI, NAQVI, and CHAWLA, did knowingly combine, conspire, confederate and agree together, with each other, and with other persons, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A), by transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer, monetary instruments and funds from and through a place in the United States to and through a place outside the United States, that is, Iran and Iraq, with the intent to promote the carrying on of specified unlawful activity, that is, a violation of 50 U.S.C. §§ 1701-1706.

**(Conspiring to Engage in International Money Laundering**, in violation of Title 18, United States Code, Sections 1956(a)(2)(A), (c)(7)(B)(v)(II), and (h))

## FORFEITURE ALLEGATIONS

1. Upon conviction of any of the offenses alleged in Counts One, Two, Three, Four, and Six of this Indictment, defendants shall forfeit to the United States any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C); and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from, proceeds traceable to these offenses.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    A. cannot be located upon the exercise of due diligence;

    B. has been transferred or sold to, or deposited with, a third party;

    C. has been placed beyond the jurisdiction of the Court;

    D. has been substantially diminished in value; or

    E. has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); and Title 28, United States Code, Section 2461(c).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Sections 982(a)(1) & (b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

*Michael R. Sherwin / [signature]*
Attorney of the United States in
and for the District of Columbia