**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 20-181 (CRC)** |
| | : | |
| **MUZZAMIL HUSNAIN ZAIDI,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. Defendant Muzzamil Husnain Zaidi has pled guilty to Counts One and Two of the Indictment, charging him with Conspiracy to violate the International Emergency Economic Powers Act (IEEPA), in violation of 18 U.S.C. § 371, and willful violations of IEEPA, in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 560.204 & 560.206 Exec. Order No. 13.876; and 18 USC § 2. As detailed below, the government recommends a sentence within the applicable U.S. Sentencing Guideline (U.S.S.G. or Guidelines) range of 37 to 46 months' imprisonment. The government believes that such a sentence would be "sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (citing 18 U.S.C. § 3553(a)).[1]

## PROCEDURAL HISTORY

On August 17, 2020, Judge G. Michael Harvey signed a criminal complaint charging Zaidi and his co-defendants, Asim Mujtaba Naqvi and Ali Chawla, with violations of IEEPA, 50 U.S.C.

---

[1] The government is filing the exhibits to this memorandum under seal pursuant to the Protective Order issued in this case (ECF 28).

§§ 1701-1706, and charging Zaidi alone with violations of 18 U.S.C. § 951 (Agent of a foreign government). On September 3, 2020, Zaidi, Naqvi, and Chawla were indicted on charges of (1) conspiracy to violate IEEPA, in violation of 18 U.S.C. § 371; (2) substantive violations of IEEPA, in violation of 50 U.S.C. §§ 1701-1706; and (3) conspiring to engage in international money laundering, in violation of 18 U.S.C. § 1956(h). Zaidi also was charged with illegally acting within the United States as an agent of the government of Iran (GOI), in violation of 18 U.S.C. § 951.

On May 1, 2024, Zaidi pled guilty to Counts One and Two of the Indictment.[2] That same day, Naqvi entered a guilty plea to Counts One and Four of the Indictment. Sentencing for Zaidi will be held on August 13, 2024, and for Naqvi on October 1, 2024.

## FACTUAL SUMMARY

### Overview

From at least December 2018 to December 2019, Zaidi and other conspirators collected, in the United States, (1) a religious tax equal to one-fifth of a person's unused annual income known as "khums" on behalf of several imams, including Ayatollah Ali Husseini Khamenei, the Supreme Leader of the Islamic Republic of Iran (Supreme Leader of Iran); and (2) other funds in the form of U.S. dollars, and caused that money to be transported to Iran, including through Iraq and other countries. Zaidi and other conspirators arranged for U.S. dollars collected in and exported from the United States to be received by the Supreme Leader of Iran's office in Iran and elsewhere in Iran. Zaidi and other conspirators raised much of this money through a campaign that promised to provide humanitarian assistance in Yemen. Statement of Offense in Support of Zaidi's Plea Agreement [ECF 157] at 2. Zaidi and his conspirators transported this money to Iran without

---

[2] Zaidi was prepared to plead guilty and accept responsibility at least by September 2023; the delay between when he initially signed the plea letter and when he entered his guilty plea was mainly due to lingering discovery issues outside of his control.

having first obtained the required license from the Office of Foreign Assets Control (OFAC) in the District of Columbia. *Id.* at 6. They did so but using numerous other individuals, including friends and family members, who were traveling overseas, to carry cash with them; these individuals often hid or were not truthful about the source or ultimate destination of the funds. *See* discussion below; *see also* Aff. in Support of Crim. Complt. at ¶¶ 78-88, 92-95, 97-98, 100-101, 106-107 & 109-112.

The GOI is a foreign power with which the United States has no formal diplomatic relations. The U.S. Secretary of State has named Iran a state sponsor of terrorism every year since 1984; Iran is one of only three countries to be so named. The United States has imposed economic sanctions on Iran since 1995. As detailed below, on June 24, 2019, the President imposed additional sanctions on the Supreme Leader of Iran and his office. Among other things, the sanctions prohibit the provision of funds to, or for the benefit of, the Supreme Leader of Iran and his office. ECF 157 at 5-6; Zaidi Presentence Investigative Report (PSR) [ECF 169] at ¶ 51.

### Background on Defendant Zaidi

Zaidi was born in Pakistan in 1984 and became a U.S. citizen in 2005. He worked in the banking industry, including as a banking center manager and branch manager, from approximately 2004 to 2014. From August 2014 until his arrest in this case in August 2020, Zaidi resided primarily in Qom, Iran, where he attended a seminary known as Al-Mustafa International University (Al-Mustafa University).[3] After Zaidi moved to Iran, he continued to travel to and from

---

[3] Jamiat Al Mustafa University, also known as Al-Mustafa International University (Al-Mustafa University), was rebranded in 2007 under the direction of the Supreme Leader of Iran to export Iran's revolutionary ideology. More than 45,000 foreigners from 126 countries have graduated from Al-Mustafa University since its inception. As of October 2016, there were approximately 25,000 individuals from 130 countries enrolled at the various branches of the university. ECF 169 at ¶ 50.

the United States. While in the United States, Zaidi has resided primarily in the Houston, Texas area. ECF 157 at 2; ECF 169 at ¶ 47. From the fall of 2019 to May 2024, Zaidi served as a part-time adjunct professor at a community college in Houston. ECF 169 at ¶ 134. He is qualified to give lectures in the community and to be an Imam; Zaidi periodically leads prayer in mosque. *Id*. at ¶ 135.

Zaidi has expressed support for the Supreme Leader of Iran and the GOI, and has encouraged others to do so, since 2015. On July 28, 2015, less than a year after he moved to Iran and began attending Al-Mustafa International University, Zaidi emailed the email address for the Supreme Leader of Iran's website and stated that he was living in Qom, Iran, and wanted to serve and strengthen the Islamic movement. Zaidi described himself as an American who had achieved a bachelor's degree in political science and a master's degree in "Homeland and International Community." He further wrote that he believed he could serve the "Islamic Republic in [the] socio-political arena or [maybe] in some other field," and asked for guidance from the Supreme Leader of Iran on how to best serve Islam. The message was signed, "Muzzamil Zaidi" and included Zaidi's phone number. Ex. 1 [Confidential_USAO-000345].

On April 22, 2020, the Tehran Times published an article that described an event held in Qom, Iran, on February 21, 2020, that was organized by the Students of Qom—a group of non-Iranian seminary students and revolutionary activists living and studying in Qom. According to the article, defendant Zaidi emceed the event to mark the anniversary of the Islamic Revolution. U.S. and Israeli flags were used as floor mats at the event. The event ended with the audience's chants of death to America, death to Israel, and pledging allegiance to the Supreme Leader of Iran. A court-authorized search of defendant Zaidi's Gmail account revealed multiple images that appeared to corroborate facts contained in the Tehran Times, including images of defendant Zaidi

speaking from behind a podium. ECF 169 at ¶ 69.

Zaidi has shown a marked disregard for U.S. laws. In or around 2019, Zaidi applied for and received benefits under Texas's Supplemental Nutrition Assistance Program (SNAP), which is funded by the federal government. Because he did not actually need these benefits, he would lend his Electronic Benefit Transfer (EBT) card (the card used to access the SNAP cash benefits) to friends and family members, sometimes in exchange for money. Examples of this fraudulent activity are listed below:

- In July 2019, Zaidi told an associate that Zaidi had received his food stamp card and if the associate needed to buy things, he could use Zaidi's card. Ex. 2 [Sensitive_USAO-004325] at 3.

- In late August 2019, Zaidi and Naqvi discussed how to use Zaidi's EBT card, and Zaidi asked if a grocery store owner Naqvi had identified would be willing to commit fraud by giving them money after the scam. Ex. 3 [Sensitive_USAO-006787] at 2.

- In September 2019, Zaidi told an associate that Zaidi had received his EBT card but had no use for it. Zaidi explained that he was going to offer a friend and a relative a discount on groceries that they needed to purchase if they used his EBT card. Ex. 4 [Sensitive_USAO-006762] at 2.

- In late October 2019, Zaidi loaned his EBT card to an associate, whose wife used it to go shopping. Ex. 5 [Sensitive_USAO-005703] at 2.

- In August 2020, Zaidi told Naqvi that Zaidi had received two EBT cards for groceries, which he planned to give to relatives. Ex. 6 [Confidential_000001] at 5.

Zaidi also discussed applying for a Small Business Administration (SBA) loan so that he

would not have to work and actively encouraged and assisted others in filing for unemployment benefits, regardless of whether they were entitled to those benefits. Examples of this fraudulent activity are listed below:

- In June 2020, Zaidi and an associate discussed filing for unemployment so that Zaidi would not need to work and applying for SBA loans that Zaidi can exploit by any means possible. Ex. 7 [Sensitive_USAO-008567].

- In June 2020, Zaidi encouraged an associate to apply for unemployment, claiming that everyone is taking advantage of disaster employment and that he and his wife both applied and got approved for it. Ex. 8 [Sensitive_USAO-007208] at 2.

- In late June 2020, Zaidi encouraged Naqvi to apply for unemployment. When Naqvi asked how Naqvi could apply for his mother when she has never worked, Zaidi suggested Naqvi lie about his family's work status to apply for unemployment. Ex. 9 [Sensitive_USAO-007159] at 2-3.

- In July 2020, Zaidi encouraged an associate in his early 20s (Person R) to apply for SBA loans. Ex. 10 [Sensitive_USAO_034151] at 7.

- In August 2020, Zaidi told Naqvi that Zaidi's wife's unemployment based on the COVID-19 pandemic had been approved and suggested that Naqvi also apply since it was getting approved for everyone. Ex. 6 [Confidential_000001] at 5.

Further, in a June 2020 conversation with one of his brothers, Zaidi and this brother discussed how it was perfectly appropriate to lie to the police and "scam" others in the United States. Ex. 11 [Sensitive_USAO-007026]. In or around 2020, Zaidi directed Person R to incur large amounts of credit card debt with the intent to default on that debt and defraud the U.S. financial system. Ex. 10 [Sensitive_USAO_034151] at 2-3; Ex. 12 [Sensitive_USAO-034128] at 1.

**Zaidi Knew of U.S. Sanctions Against Iran.**

During the conspiracy, Zaidi was aware of the U.S. sanctions imposed against Iran. For example, starting at least in or around October 2018, Zaidi visited OFAC's enforcement pages. Ex. 13 [Confidential_USAO-000495].

On June 24, 2019, former President Trump issued Executive Order 13,876, imposing sanctions on the Supreme Leader of Iran and the Supreme Leader's Office. Exec. Order No. 13,876; 84 Fed. Reg. 30,573 (Jun. 26, 2019). These additional steps were taken in response to "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East [and] promote international terrorism." Zaidi knew about this order, and that collection of khums in the United States on behalf of Iran's Supreme Leader was illegal. On June 24, 2019, the day the order was issued, Zaidi sent an email to Naqvi containing a link to a news article about the Executive Order imposing sanctions on the Supreme Leader of Iran. Ex. 14 [Confidential_USAO-186662]. Zaidi then asked Naqvi if he had read the news that he shared with him regarding this issue. After Naqvi replied that he had read it that morning, Zaidi said, "Hmm. This is a straight hit on khums… on the Rahbar [Supreme Leader]. [Pause] It is a hit on khums." Ex. 15 [Sensitive_USAO-036028].

**Zaidi and Others Conspired to Move U.S. Dollars to Iran.**

On December 5, 2018, Zaidi received written permission to collect khums on behalf of the Supreme Leader of Iran. ECF 157 at 3. On February 28, 2019, Zaidi received a second written permission letter from Ayatollah Araki. *Id*. at 3-4. Both letters were signed by Ayatollah Araki. As detailed below, Zaidi and his coconspirators worked together to collect and distribute the khums money in accordance with this authority.

**Yemen Civil War**

Since approximately 2015, two factions have been fighting for control of Yemen: the current government of Yemen and the Houthis, a Shia militant group. The Iranian regime has continued to foment violence, both directly and through proxies, in several countries, including Yemen. Iran provided weapons and support to the Houthis, and the IRGC, a branch of Iran's armed forces, continued to maintain a presence in areas of Yemen controlled by the Houthis. Saudi Arabia—Iran's key ideological and geopolitical adversary in the region—has been supporting the current Yemeni government. Aff. in Support of Crim. Complt. at ¶ 27. Zaidi appears to have been aware of Iran's role in the conflict. *See* Ex. 16 [Confidential_USAO-000645] at 2 (showing Zaidi's internet search history and site visits in March 2016).

**Islamic Pulse's Yemen Campaign**

From at least December 2018 to December 2019, Islamic Pulse was a publicly available, multimedia website that hosted images, videos, and articles about Shia Islam and Iranian culture. Shia seminary students in Qom, Iran, including Zaidi and Defendant Ali Chawla, staffed or otherwise supported Islamic Pulse. Islamic Pulse was not a registered charity and did not have a bank account. ECF 157 at 2-3.

On July 6, 2019, Islamic Pulse published an approximately five-minute long, English-narrated video titled "Islamic Pulse Funds Yemen (Campaign)" ("the IP Yemen Video"). Ex. 17;[4] ECF 169 at ¶ 58. The IP Yemen Video implored viewers to give khums or donations to Islamic Pulse's representatives, for its Yemen campaign that promised to help victims of the Yemeni civil war ("the Yemen Campaign"). The video claimed that the Yemen Campaign had collected close

---

[4] A copy of this video has been shared with the Court and the defense via USAFx. It was also produced in discovery.

to $90,000 and that donations had come from multiple countries, including the United States, and transited Iran *en route* to Yemen. *Id*. at 2:10-2:15. The video shows an animation depicting cash flow from the United States and other countries to Iran, and then on to Yemen. *Id*. at 2:26.

The video further stated that the Yemen Campaign had received permission to collect khums on behalf of the Supreme Leader of Iran, as well as on behalf of two other ayatollahs. The video instructed viewers to send an email to an identified email account (Email Account 1) associated with Islamic Pulse if they wished to donate or contribute khums to the Yemen Campaign. *Id*. at 4:36. Islamic Pulse members asked that khums be provided in U.S. dollars. *Id*. at 4:27-4:36. Ayatollah Araki appears in the video and commends Islamic Pulse for its work. He also states, "With our supervision and help, these brothers will be able to get these donations to the oppressed Yemenis, who have been oppressed by the enemy. We should recognize that the leader, Grand Ayatollah Khamenei, has emphasized the importance of helping the people of Yemen." *Id*. at 2:51-3:10.

When individuals emailed Email Account 1 asking about how to pay khums or donate money and how the money would be spent in Yemen, the user(s) of Email Account 1 would (1) acknowledge that IP Funds Yemen was not a registered charity and did not have a bank account; (2) seek donations in U.S. dollars and/or euros over other currencies; and (3) demonstrate knowledge that U.S. sanctions generally prohibited U.S. dollars from being used the way the campaign planned to use them. Exs. 18-20 [Confidential_USAO-019223, 020497 & 020830]; Aff. in Support of Crim. Complt. at ¶ 64.

Users of Email Account 1 told potential donors that they were operating out of Iran and would ask that donors route their money through a student in Qom or through someone who is traveling to Qom—even when the donor noted that he or she was in the United States—thus

encouraging these potential donors to violate U.S. sanctions. *See, e.g.*, Exs. 21-25 [Confidential_USAO-018977, 019083, 019110, 019137 & 019204]. At least one donor stated that he/she had spoken to "brother Muzzamil," believed to refer to Zaidi. Ex. 26 [Confidential_USAO-020789]. As some of the potential donors pointed out (Ex. 27 [Confidential_USAO-020806]), there were legal means to donate money to needy people in Yemen. For example, UNICEF has been providing humanitarian aid to Yemen since 2015.[5]

Despite what the defense may claim now, emails between potential donors and users of Email Account 1 show that conspirators told potential donors that "a portion of khums [donated as part of the campaign] goes to Yemen and a portion goes to the office of the marja."[6] Ex. 28 [Confidential_USAO-018806]; *see also* Exs. 29-31 [Confidential_USAO-019131, 019153 & 019200]. In response to one email asking if there were a way to transfer money from Singapore to needy people in Yemen, a user of Email Account 1 wrote, "Not directly. They will have to come to Qom first. Then, definitely yes." Ex. 21 [Confidential_USAO-018977]. This routing ensured that all the donations were routed through Iran—in many instances in violation of IEEPA. In February 2019, Zaidi told a female caller that he was dealing directly with Ayatollah Araki's office and with an organization whose office was in Tehran. Ex. 32 [Sensitive_USAO-008567]. The government has produced in discovery copies of official receipts stamped by the office of the

---

[5] *See* _____ https://www.unicefusa.org/where-unicef-works/middle-east/yemen#:~:text=How%20UNICEF%20is%20helping%20children,partners%20to%20meet%20urgent%20needs (last visited on August 4, 2024) ("UNICEF has been on the ground in Yemen since civil conflict began in March 2015, leading the way to provide water, nutrition, education and protection to children and families while collaborating closely with partners to meet urgent needs.").

[6] A marja is a surrogate of the head of the Islamic State of Iran, a Grand Ayatollah with the authority given by an Islamic seminary to make legal decisions within the confines of Islamic Law for followers and lower-ranking clerics. Aff. in Support of Crim. Complt. at ¶ 24 & n.3.

Ayatollah Araki and/or the office of the Supreme Leader of Iran indicating the receipt of khums in varying amounts paid by and through Zaidi on specified dates. *See* ECF 157 at 5.

Zaidi and other conspirators enlisted friends, family members, and associates to transport money collected in the United States to Iran on at least four occasions. Zaidi and other conspirators intentionally caused each person to carry less than $10,000 out of the United States, to avoid the requirement to file a CMIR and/or law enforcement scrutiny. *Id*. at 4. In or around September 2019, several relatives of Zaidi's traveled to Iran from the United States, carrying with them U.S. currency structured to avoid reporting requirements. During CBP questioning after one of these relatives returned to the United States, this relative (Person H) admitted that Zaidi and others collected money from various individuals (in the United States) and sent it in increments of under $10,000 for ultimate delivery to Iran and elsewhere. Aff. in Support of Crim. Complt. at ¶ 82; Ex. 33 [Sensitive_USAO-000183] at 4-5.

### Zaidi and Naqvi Sent U.S. Dollars to Iran Using Arba'een Pilgrimage Travelers.

One transfer of dollars to Iran took place in the context of a group of travelers going on a yearly religious pilgrimage to Iraq for Arba'een in October 2019. Zaidi, Naqvi, and their coconspirators sent thousands of dollars from the United States through Iraq to Iran via the travelers on the pilgrimage. Statement of Offense in Support of Naqvi's Plea Agreement [ECF 161] 4. Zaidi and others referred to these travelers as the "youngsters." *See, e.g*., Ex. 34 [Sensitive_USAO-005316] at 3.

On October 12, 2019, a group of approximately 25 individuals traveled from Houston to Iraq for the Arba'een pilgrimage. ECF 161 at 5. Many of them carried money destined for Iran. *Id*. Zaidi told Naqvi that he had sent $45,000 to Iran with the group who had traveled to Iraq for Arba'een. Ex. 35 [Sensitive_USAO-004976] at 2. After the travelers left the United States, Naqvi

and Zaidi discussed whether the travelers had made it through airport security. On the return trips, when many of the travelers were pulled aside by CBP, Naqvi and Zaidi expressed concern that one or more of the travelers might tell CBP officers that they were carrying money on behalf of Naqvi, Zaidi, and their coconspirators. *Id.*; Ex. 36 [Sensitive_USAO-35762] at 2. When other travelers and their family members expressed concerns about the airport scrutiny, Naqvi attempted to calm them down. On October 28, 2019, Naqvi described these attempts to Zaidi as "damage control." ECF 161 at 5.

### Zaidi Failed to Comply with U.S. Laws on Licensing and Notification.

At no time during the period from December 2018 through December 2019, did Zaidi obtain the required license from OFAC to export or reexport goods to Iran or to the Supreme Leader of Iran or to provide services to Iran or to the Supreme Leader of Iran. Zaidi knew at the time he provided the services described above that it was unlawful for him to do so. Ex. 157 at 6. Zaidi's failure to apply for a license from OFAC prevented the U.S. government from determining whether and on what terms it would allow Zaidi to provide his services to Iran.

### SENTENCING RECOMMENDATION AND ANALYSIS

The government recommends that the Court sentence Zaidi to a sentence within the applicable Guideline range of 37 to 46 months' imprisonment. *See* ECF 169 at ¶ 154. The Probation Officer has not identified any circumstances that are not adequately considered within the Guidelines. *See id.* at ¶ 183. As discussed below, the Sentencing Guidelines should be the starting point for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

The government submits that a sentence within the applicable Guideline range also would comply with the purposes of federal sentencing laws as provided in 18 U.S.C. § 3553(a).

As discussed below. a comparison of sentences meted out in comparable cases further supports the government's recommendations, showing that the requested sentences are well within the range of similar sentences imposed for similar conduct.

## Legal Standards

"Federal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing, in light of the Guidelines and other § 3553(a) factors." *Freeman*, 564 U.S. at 529 (citing 18 U.S.C. § 3553(a)). When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1) and (2). Furthermore, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall*, 552 U.S. at 49. The Supreme Court has "recognized that, in the ordinary case, the Commission's recommendation of a sentencing range

will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). As one member of this Court has held, "*Booker* requires judges to engage in a two-step analysis to determine a reasonable sentence." *United States v. Doe*, 413 F.Supp.2d 87, 90 (D.D.C. 2006) (Bates, J.). Accordingly, after reviewing the Guidelines calculation, "the [court] should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented." *Gall,* 552 U.S. 38 at 49-50 (citations omitted).

## **Sentencing Guidelines Calculation**

The government agrees with the Probation Officer that the applicable Guideline range for Zaidi is 37 to 46 months in prison, based on a total offense level of 21 and a Criminal History Category of I. ECF 169 at ¶ 154. The government also agrees with the Probation Officer that the fine Guideline range for Zaidi is $15,000 to $1 million. *Id*. at ¶ 181. As explained below, based on an analysis of the factors set forth in 18 U.S.C. § 3553(a), the government submits that a sentence within the applicable Guideline range is appropriate here.

Further, the government agrees with the Probation Officer that the Guideline range for a violation of 18 U.S.C. § 371 follows the underlying substantive offense.

## **Statutory Penalties**

For his conviction on Count One of the Indictment, Zaidi faces a maximum sentence of 5 years' imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3), or twice the pecuniary gain or loss, pursuant to 18 U.S.C. § 3571(d); and mandatory restitution under 18 U.S.C. § 3663A. Plea Agreement at ¶ 1. The Court also may impose a term of supervised release of up to

14

three years, pursuant to 18 U.S.C. § 3583(b)(2). ECF 169 at ¶ 162. The Guideline range is 1 to 3 years, based on the offense being a Class D felony. *Id*. at ¶ 164.

For his conviction on Count Two of the Indictment, Zaidi faces a maximum sentence of 20 years' imprisonment, a fine of not more than $1,000,000, or both. 50 U.S.C. § 1705; 18 U.S.C. § 3571(b)(1); *see also* Plea Agreement at ¶ 1. The Court may impose a period of not more than three years of supervised release. 18 U.S.C. § 3583(b)(2). ECF 169 at ¶ 162.

<u>**Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)**</u>

As discussed below, an analysis of the factors provided in 18 U.S.C. § 3553(a) shows that a sentence within the applicable Guideline range is an appropriate sentence in this case.

### 1.      *The Nature and Circumstances of the Offense*

The nature and the circumstances of the offense are undoubtedly serious: Zaidi's conduct has provided financial support to the GOI and persons in Iran. Moreover, Zaidi has encouraged others to violate the law, has shown a marked disrespect for the law, and has abused his standing in the community to flout U.S. law.

The laws that Zaidi admitted to violating further reflect the seriousness of his offenses. A violation of the laws prohibiting certain transactions with Iran is a significant criminal offense because, as then-president Bill Clinton declared in an Executive Order issued on March 15, 1995, those sanctions were implemented to combat the "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" caused by the GOI. Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 17, 1995). Each subsequent President has extended the sanctions against Iran. In other words, violating the sanctions laws constitutes a serious criminal offense because those laws help protect the national security and economy of this country, and advance our foreign policy with respect to Iran. The crime of violating the IEEPA statutes, enacted

to protect the United States from terrorism and state-sponsors of terrorism, carries a maximum penalty of no more than 20 years of incarceration, a heavy punishment equal to the gravamen of the crime.

The U.S. Sentencing Commission has recognized the seriousness of providing services to Iran in particular. U.S.S.G. § 2M5.1 provides for a base offense level of 14, unless a national-security control was violated or the defendant engaged in a financial transaction with a state sponsor of terrorism, in which case the base offense level is 26. *Compare* U.S.S.G. § 2M5.1(a)(1) *with* § 2M5.2(a)(2); *see also United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (holding that an IEEPA violation is an evasion of a national security control, regardless of the nature of the good itself). That *twelve-level* difference underscores the seriousness of acting as an agent or providing services to a country like Iran.

### 2. *The History and Characteristics of the Defendant*

Zaidi was born in Karachi, Pakistan in 1984 and moved with his family to the United States in 1999. Zaidi became a U.S. citizen in January 2005. He lived in Iran from 2014 to 2020 but frequently returned to the United States to visit. Zaidi is well educated and capable of making a living through non-criminal means when he is released from incarceration.

### 3. *The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public*

Deterrence and promoting respect for the law should be the principal goals of the Court's sentences in this case. To promote respect for the law—both by the defendant and the public—it is necessary and appropriate to impose a meaningful sentence. Zaidi's disregard for U.S. law—not only in the context of this case but also in other aspects of his life, as discussed above—illustrates why the recommended sentence is justified to protect this country from new illegal schemes that Zaidi, or others, might formulate. A sentence that is too lenient would convey the wrong message

and could convince others that the rewards of providing illegal services to Iran, are worth the risk of getting caught by U.S. law enforcement and facing a relatively minor penalty.

### 4.      *The Need to Avoid Unwarranted Sentencing Disparities*

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government acknowledges that sentences for violations of IEEPA, as well as for conspiracies to commit this offense, vary greatly—sentences commonly range from as low as 14 months to as high as the statutory maximum, with many permutations in between. At the same time, the government's requested sentences are squarely within the range of similar sentences that have been imposed for similar offenses.

Viewed in light of past sentences for violations of IEEPA, a sentence within the applicable Guideline range for Zaidi is consistent with sentences imposed on similarly situated defendants. For example, in *United States v. Arsalan Shemirani*, 12-cr-0075 (D.D.C. Leon, J.), the defendant pled guilty, pursuant to a cooperation plea agreement, to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for purchasing nearly 3,700 electronic components with a total cost of more than $187,000 that were then illegally exported to his brother in Iran. Although the government requested a sentence of 36 months to account for the defendant's cooperation, the court sentenced Shemirani to 48 months. This sentence was affirmed on appeal. *United States v. Shemirani*, 800 F.3d 1, 3-4 (D.C. Cir. 2015). In *United States v. Mohammad Reza Haijan*, 08:12-cr-00177 (M.D. Fla.), the defendant pled guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting computers and computer-related equipment to Iran and was sentenced to 48 months' imprisonment. In *United States v. Laura Wang-Woodford*, 03-cr-0070 (E.D.N.Y.) the defendant pled guilty to one count of conspiring to violate IEEPA for her

involvement in shipping aircraft component parts to Iran through other countries, and was sentenced to 46 months' incarceration, at the upper end of the range of the stipulated 37-46 month-range contained in the parties' plea agreement.[7]

Zaidi's exports to Iran—cash that he and others required be routed through Iran—were as serious as the exports at issue in the cases discussed above or in most of the legions of other IEEPA cases involving illegal imports of goods to Iran. Cash, being fungible, can be used to purchase anything, and U.S. dollars likely are hard to come by in Iran due to the U.S. sanctions.

Moreover, according to the Guidelines Application Notes,

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences.

U.S.S.G. § 2M5.2 app. n.2 (Nov. 1, 2012). Zaidi's crime involved extensive planning and deceit and the encouragement of others, including persons much younger than Zaidi, to violate the law. In connection with the Arba'een export of money described above, Zaidi and others recruited Islamic young adults traveling on a religious pilgrimage to further the criminal conspiracy. Accordingly, a sentence within the Guideline range is appropriate here.

The United States designated Iran as a state sponsor of terrorism in 1984 and considers Iran to be a geopolitical opponent. The cases above demonstrate that the government's recommendation in this case falls squarely within the heartland of similar cases. For all the reasons stated above, a

---

[7] The PSR notes that, during the last five fiscal years, sentences for the four defendants with the same primary guideline, final offense level, and criminal history category as Zaidi, were an average 14 months' imprisonment imposed, with a median of 15 months' imprisonment, after excluding defendants who received a §5K1.1 substantial assistance departure. ECF 169 at ¶ 186. Without any specifics about those cases, it is impossible to determine how comparable they are to the facts of this case.

sentence within the applicable Guideline range for Zaidi is warranted by his actions taking advantage of the freedoms afforded by the U.S. Constitution to export U.S. dollars to a hostile foreign regime. The requested sentence is well within the range of previous sentences imposed in similar cases, which satisfies 18 U.S.C. § 3553(a)(6).

## **CONCLUSION**

WHEREFORE, the government respectfully recommends that the Court sentence Zaidi to a sentence within the applicable Guideline range of 37 to 46 months in prison.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar 481052

By:    */s/Jolie F. Zimmerman*
Jolie F. Zimmerman
Erik M. Kenerson
Assistant United States Attorneys
D.C. Bar No. 465110 (Zimmerman)
Ohio Bar No. 82960 (Kenerson)
United States Attorney's Office for the District of
  Columbia
601 D Street, N.W.
Washington, DC 20530
(202) 252-7220 (Zimmerman)
(202) 252-7201 (Kenerson)
Jolie.Zimmerman@usdoj.gov
Erik.Kenerson@usdoj.gov