**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | **No. 1:20 Cr. 181 (CRC)** |
| : | |
| **MUZZAMIL ZAIDI,** : | |
| : | |
| **Defendant.** : | |

## MUZZAMIL ZAIDI'S MEMORANDUM IN AID OF SENTENCING

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, N.Y. 10036
(212) 336-2000

*Counsel for Muzzamil H. Zaidi*

## PRELIMINARY STATEMENT

Muzzamil Zaidi is a deeply pious man who has dedicated his life to providing support, guidance, and empathy to others, particularly those in need and those struggling through difficult times. As the more than one hundred attached letters of support attest, Mr. Zaidi has had a material, positive impact on dozens and dozens of lives in the United States and abroad. The course of conduct underlying Mr. Zaidi's guilty plea represents a sharp departure from his otherwise law-abiding life. But, as those who know him best have explained, he was motivated by his longstanding commitment to helping others in need and his devotion to alleviating human suffering. This is not to say that his crimes were justified: Mr. Zaidi fully accepts responsibility for his crimes and knows that what he did was wrong. He understands that there is no excuse for breaking the law, and he is committed to never again running afoul of the law or causing his family to endure the hardship they have experienced over the last four years. There is zero risk here of recidivism.

Mr. Zaidi pleaded guilty to one count of violating the International Emergency Economic Powers Act ("IEEPA") and one count of conspiracy to violate IEEPA. The offense conduct relates to an effort by Mr. Zaidi—then a seminary student studying to be a Muslim cleric—and other seminary students from late 2018 to late 2019 to raise money in the United States and elsewhere to send to Yemeni civilians who were in desperate need of food, water, shelter, and housing due to a brutal civil war. In its 2019 Country Report on Human Rights in Yemen (the "2019 Yemen Report"), the U.S. State Department described the "marked increase in food insecurity throughout the country," citing United Nations statistics showing that "65 percent of the total population was food insecure, 9.9

1

million were acutely food insecure, and 7.4 million children were malnourished." 2019
Country Reports on Human Rights Practices: Yemen, U.S. STATE DEP'T,
https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/yemen,
App. at A-331. The 2019 Yemen Report described "24.1 million individuals in need of
aid" and "more than 15.9 million individuals [who] were completely reliant on
humanitarian food assistance." *Id.* President Biden succinctly described the "unendurable
devastation" resulting from the years-long war as a "humanitarian and strategic
catastrophe." Remarks by Pres. Biden on America's Place in the World (Feb. 4, 2021),
App. at A-365.

The humanitarian catastrophe in Yemen was man-made; it was the result of the
civil war and a blockade that largely prevented aid from getting into the country. As of
late 2018, Saudi Arabia and a group of other nations had maintained a years-long blockade
around Yemen, making it extremely difficult to send funds into the country to pay for
critical humanitarian relief and to alleviate the suffering of women, children, and other
non-combatants. The coalition closed all land, sea, and air ports into the country. The little
humanitarian aid that could be arranged by the United Nations and various aid groups was
delayed and was not reaching its intended recipients. In the 2019 Yemen Report, the State
Department described the "significant challenges and delays in the distribution of aid
around the country due to a confluence of factors including bureaucratic constraints, airport
closures, port closures, frequent checkpoints on roads, and restricted access." 2019
Country Reports on Human Rights Practices: Yemen, U.S. STATE DEP'T,
https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/yemen,
App. at A-330.

It is in this context that Mr. Zaidi's criminal offenses must be understood.  A group of seminary students, including Mr. Zaidi, who were committed to surmounting these obstacles, began a fundraising campaign (the "Yemen Campaign") on behalf of suffering Yemeni civilians through a student-run YouTube channel, Islamic Pulse, to deliver aid directly to people in need.

Though not himself a member of Islamic Pulse, Mr. Zaidi was passionate about the cause of Yemeni civilians and was eager to join forces with the group on their Yemen Campaign efforts.  To jumpstart their fundraising efforts, Mr. Zaidi appealed to senior Shia Muslim religious figures on behalf of the campaign to request permission for 100% of religious donations, known as *khums*, to be used for the benefit of Yemeni civilians.  In the Shia faith, half of a donor's *khums* must be tendered to the office of the religious leader whom the donor follows, and those funds are reserved for use by that office, typically for charity or religious education.  (The remaining half of *khums* may be donated to a broader set of charitable recipients.)   In December 2018, Mr. Zaidi requested and received permission from certain Shia leaders for *all* of the *khums* raised by the Yemen Campaign to go to benefit Yemeni civilians, resulting in twice as much critical and life-saving support to Yemen.  But because of the Saudi blockade, funds raised in the United States were routed through Iran or Iraq, and then delivered to Yemen.  A video prepared at the time by Islamic Pulse, entitled "IP Yemen Campaign," explains how the money was raised and transferred. That video is linked here.  *See* IP Yemen Campaign Video (July 6, 2019), https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.

Mr. Zaidi recognizes that there are severe restrictions on sending money to Iran under U.S. law (even if the money is subsequently transferred to a third, unsanctioned

country, like Yemen), and that those restrictions represent the considered views of the U.S. government.  He deeply regrets his actions and fully accepts that he should have pursued his goal of providing relief to Yemeni civilians in a lawful manner, rather than bypassing the U.S. government's regulations and transferring money through unlawful channels.  But his actions were not motivated by personal profit, self-aggrandizement, or an intent to benefit or serve a foreign country or foreign leader.  Rather, Mr. Zaidi was moved to act because of what was happening in Yemen: tens of thousands of civilians were dying and millions of non-combatants were displaced by the war.  His commitment to serving humanity, and in turn his religion, are traits that were passed down from his father, Muhammad Sayedain Zaidi, a lawyer who provided pro bono counsel to persecuted members of the Shia minority in Pakistan and was assassinated as a result.  Some of Mr. Zaidi's siblings are physicians and serve the community by providing medical care to their patients, including many who cannot afford such care; all his other siblings contribute to their communities in different meaningful ways.  Mr. Zaidi serves others primarily through religious and spiritual teaching, counseling to those in need, and organizing community service events.  As the dozens of heartfelt letters of support attest, Mr. Zaidi's work on behalf of others has had a profound and meaningful impact on many, many lives across the world.

The last four years have been very difficult for Mr. Zaidi and his family.  Mr. Zaidi was incarcerated for fourteen days in the Harris County Jail in Houston, then spent seventeen months in home detention, followed by two-and-a-half years of pretrial release with strict curfew conditions.  Mr. Zaidi's ability to work, serve his community, and spend time with loved ones has been extremely limited, yet he still found ways to contribute to

his community in Houston and around the world.  Because of the COVID pandemic and the slow pace of the production of classified discovery and unclassified discovery (much of which was initially classified, but then de-classified for production), this case has proceeded very slowly.  Mr. Zaidi was prepared to accept responsibility for his offenses many months ago.   The extensive restrictions on Mr. Zaidi's liberty, his loss of employment, and his adherence to the conditions of his years-long term of pretrial release all militate toward a finding that he has been adequately punished for his offenses.  Mr. Zaidi respectfully requests that the Court impose a sentence of time served.

## **RELEVANT BACKGROUND**

### A.    **Mr. Zaidi's Personal Life and Education**

Mr. Zaidi was born on December 16, 1984 in Karachi, Pakistan.  He is the fifth of seven children in what has always been a tight-knit family.  Mr. Zaidi's family adheres to Shia Islam and, at the time he was born, lived in a predominantly Shia community in Karachi.   Shias make up a small minority in Pakistan—approximately 10-15% of the population—where the vast majority of people follow Sunni Islam.   Shia Muslims are discriminated against in Pakistan and have periodically suffered from sectarian violence at the hands of the Sunni majority.  But through education and hard work, Mr. Zaidi's father built a solid middle-class life for Mr. Zaidi and his siblings.  Mr. Zaidi and his family are *syeds*, meaning that they trace their lineage directly to the Prophet Muhammad.  As *syeds*, they are expected to have greater communal responsibility in their Shia community.

Mr. Zaidi's father, Muhammad Sayedain Zaidi ("Sayedain"), was a practicing lawyer in Pakistan for twenty-five years.  By all measures, he was successful professionally and, in 1997, Sayedain was appointed to the prestigious post of Assistant Advocate General of the Sindh Province of Pakistan.  Despite his professional success, it was Sayedain's and

his wife Feroza Khatoon Zaidi's strong desire to bring their family to the United States so that their children could receive a better education and avail themselves of the opportunities that exist only in America.  In 1999, when Mr. Zaidi was fifteen years old, his family moved from Pakistan to the United States, pursuant to a family-based immigrant visa, sponsored by Mr. Zaidi's uncle.  Two of Mr. Zaidi's older siblings, Quratulain and Mustafa, were ineligible to relocate to the United States because of their age and remained for the time in Pakistan.

Mr. Zaidi's family moved to Bellingham, Massachusetts, a suburb of Boston.  Mr. Zaidi's father was unable to practice law in the United States and therefore took whatever jobs he could find in order to support the needs of the family, including working as a clerk at a local grocery store.  In his letter to the Court, Mr. Zaidi recalls how painful it was "to see a major shift in my father's life, as his social status changed from being in a position where high ranking officers used to salute him to working at grocery stores."  *See* Letter of Muzzamil Zaidi Letter, App. at A-001.  But the family made its way in their new home through hard work and perseverance.

Mr. Zaidi spent his sophomore and junior years of high school in Bellingham, and then in 2001, he and his family moved to Houston, where he completed his final year of high school.  Houston has a vibrant Pakistani-American community, and many of Mr. Zaidi's relatives and family friends from Pakistan lived there at the time.  Like his siblings, Mr. Zaidi was a strong, honor-roll student, despite the initial culture shock of moving to the United States and usual struggles of a teenager moving halfway across the world and adjusting to the American way of life.  Mr. Zaidi worked during high school—something he did to help with the family's finances, but also to share the burden of his father who had

6

sacrificed so much to bring his family to the United States.  *See* Letter of Muzzamil Zaidi, App. at A-001; Letter of Ali Hadi Baqir, App. at A-128.  And Mr. Zaidi made close friends, many of whom he still communicates with to this day.

Following high school, Mr. Zaidi spent two years studying at a local community college in Houston before transferring to the University of Houston, where he earned a bachelor of arts degree in political science and communication in 2008.  He later went on to earn a master's degree in international security and history from the University of Houston in 2014.  Throughout his college and post-graduate studies, Mr. Zaidi worked in retail banking, starting at Bank of America as a teller, then at Citibank, and finally at Wells Fargo, where he was promoted to the position of vice president and branch manager.  By 2014, Mr. Zaidi was managing several Wells Fargo branches in the Houston area while finishing coursework for his master's degree.

On a personal level, in January 2006, Mr. Zaidi married Sayedda Palwasha ("Palwasha"), whom he first met in Pakistan.[1]  Together, Mr. Zaidi and Palwasha have five beautiful children:  Zaier (15), Khizr (14), Shabbir (10), Kisa (5), and Sakeena (2).  Mr. Zaidi's friends and family describe him as a "devoted father" who "always prioritizes his family," including by investing in his children's academic and religious education.  *See* Letter of Turab Raza, App. at A-085.  Palwasha describes the "very close" bond that her kids have with their father, "who is there for them no matter what."  *See* Letter of Palwasha Zaidi, App. at A-114.  Khizr explains that "[w]ords cannot fully express the love and admiration" he has for his father, and Shabbir describes how his dad "does everything he

---

[1] After spending most of their marriage as a homemaker, Palwasha recently accepted a part-time job as a substitute teacher at a local Islamic private school to help make ends meet for the family while Mr. Zaidi awaits sentencing.

can to make [he and his siblings] happy." *See* Letter of Khizr Zaidi, App. at A-122; Letter of Shabbir Zaidi, App. at A-059.  Zaier, Mr. Zaidi's oldest child, describes his father as "the person whom me and many others idolize and hope to be one day…. [a] pious, god-fearing, loving, caring, honest, fearless man who will never be silent in front of oppression and always be the voice of the voiceless and oppressed people of the world." *See* Letter of Zaier Zaidi, App. at A-071.

Mr. Zaidi's mother, Feroza, and five of his six siblings still reside in the United States, primarily in the Houston area.  Mr. Zaidi's mother is now in her late seventies and struggles with dementia.  But Mr. Zaidi praises her as the rock of the family, having raised seven children and "maintained [a] peaceful, loving environment at home," despite her longstanding battle with breast cancer.  Letter of Muzzamil Zaidi, App. at A-002.  Feroza lives in Houston with Mr. Zaidi's oldest brother, Mustafa.  Mr. Zaidi's father, Sayedain, passed away in 2017, but remains an inspiration and role model for Mr. Zaidi.  In 2013, Sayedain temporarily returned to Pakistan—and to the practice of law—to represent, free of charge, more than seventy Shia men who had been detained by the Pakistani police following violence directed at the Shia community on Ashura, a holiday commemorating the death of Imam Hussain, the grandson of the Prophet Muhammad.  Sayedain and several other lawyers secured the detainees' release, attracting widespread but not universally positive media attention in Pakistan.  He returned to his family in the United States, but on a subsequent trip to Pakistan in November 2017, Sayedain was shot as he was leaving a Shia mosque in Islamabad after evening prayers and died at the age of seventy-three.  Sayedain's death was a huge blow to Mr. Zaidi's entire family.

The oldest of Mr. Zaidi's siblings, his only sister Quratulain, works for the World Bank and lives in Houston. The next oldest is his brother Mustafa. Mustafa previously worked as a psychiatrist for the Department of Veterans Affairs in Houston, but following the FBI's investigation of Mr. Zaidi, Mustafa was pushed to resign his position and began working for the State of Texas. Mr. Zaidi's second-eldest brother, Syed, is a U.S. Air Force veteran and an alumnus of the University of Texas at Austin, where he earned a bachelor's degree in biotechnology. In 2018, Syed followed Mr. Zaidi's footsteps into the seminary in Qom, Iran, after their father's passing. Mr. Zaidi's third-eldest brother, Akbar, was a vice president at local bank in Houston, but like Mustafa, lost his position at the bank when the FBI contacted the bank in connection with the investigation. Mr. Zaidi's younger brother, Fakhar, works as a physician specializing in internal medicine at TRS Health, a clinic serving the underprivileged in the greater Houston area. Fakhar reports that Mr. Zaidi's influence has "shape[d] my contributions to society, steering me towards a career that prioritizes service over profit." Letter of Fakhar Zaidi, App. at A-076. Finally, Mr. Zaidi's youngest brother, Wajahat, is a staff accountant at bicycle company based in Austin, Texas. Wajahat describes how Mr. Zaidi provided "strength and guidance" after they lost their father in 2017, serving as both a "father figure" and "moral compass." Letter of Wajahat Zaidi, App. at A-091.

### B. Mr. Zaidi's Decision to Enter the Seminary

Although religion has always played an important part in Mr. Zaidi's life, he became more devout and more focused on serving the greater good in the years following his graduation from the University of Houston in 2008. Although he was achieving financial success through a thriving career at Wells Fargo, Mr. Zaidi began to feel a sense of "spiritual hollowness" and a need to serve a higher purpose beyond making a

comfortable living as a banker.  In 2014, Mr. Zaidi applied to al-Mustafa International University, a seminary in Qom, Iran, with the goal of studying Islamic thought.  Mr. Zaidi preferred the seminary in Qom over the other major Shia seminary, located in Najaf, Iraq, because Iranian seminaries are known to emphasize philosophy and Islamic mysticism, while Arab seminaries (like the one in Najaf) tend to focus more on a rigid interpretation of Islamic scripture.  The seminary program at al-Mustafa takes six years to complete, and upon completion, students receive turbans, signifying their status as a cleric (or *imam*).  Mr. Zaidi has earned his certification as an *imam*, but he humbly submits that his journey to deepen his understanding of his faith is never-ending.

Mr. Zaidi decided to pursue seminary studies because he had noticed an unmet need:  the Shia community lacked English-speaking religious scholars who grew up in the West and could relate to the social challenges facing Shia youth in the West.  He believed that investing in his religious education would enable him to help fill this void, maximize his impact on his community, and mitigate some of the pressures and challenges facing Islamic youth and the underprivileged, regardless of their faith or ethnicity.  Mr. Zaidi's spiritual mentors have celebrated his commitment to using his religious education for the benefit of others.  Syed Farhat Abbas, the resident scholar at the Islamic Education Center of Houston, notes that Mr. Zaidi is "dedicat[ed] to supporting families in crisis, … help[ing] mend relationships and strengthen familial bonds, … educating and guiding the youth … at As-Sadiq Sunday School, … [and] distributing food to homeless individuals."  Letter of Syed Farhat Abbas, App. at A-074.  And one of Mr. Zaidi's mentors, Mansour Leghaei, the Director of eHawza School of Islamic Theology, has referred numerous students struggling with mental health and spiritual challenges to Mr. Zaidi, "who has …

successfully coach[ed] [them] to a much brighter life." Letter of Mansour Leghaei, App. at A-072.

Mr. Zaidi and his wife and children moved to Qom in August 2014. While he engaged in his studies, the family survived on a modest stipend from the seminary, money lent by Mr. Zaidi's siblings, and savings from their time in the United States. Additionally, Mr. Zaidi returned to Houston for two to three months every year to see family and, during that time, frequently drove for Uber and taught a classes at Lone Star Community College to help cover his family's living expenses for the following year in Iran.

### C.    Mr. Zaidi's Commitment to Service and to His Religion

Before, during, and since enrolling in the seminary, Mr. Zaidi has devoted immense amounts of time to counseling family, friends, neighbors, and even strangers struggling with addiction, marital conflict, and other interpersonal issues; teaching the Quran to children and adults; organizing study and book groups; and participating in community events to help the indigent and less fortunate members of society. Since Mr. Zaidi began his studies in Qom, he has also been asked on many occasions to deliver sermons at his mosque and others, and focuses most of his sermons on leading a spiritual life, giving back to society, and promoting tolerance.

Since 2010, Mr. Zaidi has devoted substantial time to counseling young people, in the Houston community and beyond, who were abusing drugs and engaging in other self-destructive behavior. One such youth was ████████, who describes himself at the time as a wayward teen but who is now a successful ██████████████. Mr. ██████ credits Mr. Zaidi with reigniting his faith, ██████████████████████████ and turning his life around. In a letter to the Court, Mr. ██████ recalls his previous disillusionment with his community and his religion ████████████████████████████████

███████████████████████████████████████████████████

███████" Letter of ████████, App. at A-097.  That changed after he met Mr. Zaidi, who approached him and his friends with a warm smile and a non-judgmental attitude. Over the next couple of years, Mr. █████'s conversations with Mr. Zaidi conversations continued, often over a meal paid for by Mr. Zaidi, and grew more personal.  Mr. █████ remembers how he "could count on [his] older brother to help [him] or guide [him] in [his] time of need," and how he ████████████, began to focus on school, and returned to prayer. *Id.* at A-098.  Mr. ███████ went back to school to become an ████████ and attributes his turnaround to Mr. Zaidi, stating that "[he] too would have been another statistic on the streets if [he] hadn't met Muzzamil that night in ███████████████."  *Id.* at A-097.  For Mr. ██████, meeting Mr. Zaidi was "one of those moments that changed the course of [his] life."  *Id.* at A-098.

Other letter writers tell equally moving stories.  Adrieene Fontenot, a former college classmate, recounts a situation in which Mr. Zaidi met a woman who had been abandoned by her husband and was left as a struggling single mother:  "Muzzamil not only donated, but raised funds on her behalf for her to receive a car, pay for her children's schooling, and assistance with her full rent for one year."  *See* Letter of Adrieene Fontenot, App. at A-063.  Another friend, Hussain Nagri, describes his work volunteering with Mr. Zaidi at their mosque, "serving food and assisting with other activities."  *See* Letter of Hussain Nagri, App. at A-083.  He notes that Mr. Zaidi went "out of his way to ensure that everyone felt welcome and taken care of, even staying late to clean up and prepare for the next day's activities"—actions that Mr. Nagri found to be "truly inspiring."  *Id.*

But these specific anecdotes do not come close to capturing all of the community service that Mr. Zaidi has performed over the last decade or more.  By way of example, his younger cousins in Australia talk of the online book club that Mr. Zaidi led for young women (sixteen- to thirty-year-olds) to discuss a "range of topics including women empowerment, moral ethics and the nature of man."  Letter of Areeba Abbas, App. at A-061.  One cousin, Areeba Abbas, writes that these sessions "have widened my thinking horizon and have enriched my spiritual and personal development journey, and have helped me become a better person, wife and a mother."  *Id.*  Her cousin, Kinza Abbas, describes Mr. Zaidi's mentorship as "awaken[ing] a fire within [her]—a fire to be better, to learn more, to help those in need, to care for the oppressed, and to use [her] voice for the betterment of humanity," also remarking how women are often not included in such intellectual conversations.  Letter of Kinza Abbas, App. at A-106.

Deep concern for others, especially women and children, has always been one of Mr. Zaidi's many virtues, as demonstrated by an incident involving a complete stranger at the time.  ███████, Mr. Zaidi reached out to ████████████████ "in hope[] of salvaging [their] marriage."  *See* Letter of ██████████, App. at A-108. After an initial conversation, however, Mr. Zaidi "realized how [she] was the aggrieved party [and] vowed to get [her] out of this relationship."  *Id.*  Mr. Zaidi's mediation and counseling allowed ███████ to █████████████████ move on with her life.  She still expresses amazement at Mr. Zaidi's "willingness to help an innocent girl who [wa]s a total stranger" and views him as her "guardian angel."  *Id.*

### D.    Mr. Zaidi's Professional Teaching

In April 2019, Mr. Zaidi traveled to the United States to speak on a panel at Columbia University, entitled "The Marginalization of Shi'a Narratives in American

Muslim Discourse" and sponsored by national and regional Muslim community organizations, and shared his thoughts on and experiences with sectarian conflict.  He returned with his family to the Houston area over the summer and, in August 2019, was offered an adjunct teaching position at Lone Star Community College in Houston to teach U.S. history.  He taught three courses during the fall 2019 semester and continued to teach U.S. and World history at Lone Star intermittently up until the date of his guilty plea.

Mr. Zaidi's students at Lone Star found him supportive and motivational.  Aaliyah Waller-Joseph, a student from the Fall 2021 semester, notes that "Mr. Z was always very professional and if we needed help on an assignment he would email us back immediately; always being appropriately available for his students."  Letter of Aaliyah Waller-Joseph, App. at A-051.  She "always bragged about how lucky [she] was to have him as a teacher." *Id.*  Another student, Victoria Ayala, remarks that Mr. Zaidi "created an environment that was favorable to [students'] intellectual and personal development, inspiring [them] to succeed and reach [their] goals."  Letter of Victoria Ayala, App. at A-053.  She explains how Mr. Zaidi frequently checked in on his students and showed "a genuine concern and eagerness to lend a help[ing] hand," including to those who were "from the lower-class side of town."  *Id.*  Ms. Ayala describes Mr. Zaidi as a "mentor" who "had a profound impact on [students'] lives."  *Id.*  Glynesia Spurlock echoes this sentiment, crediting Mr. Zaidi's patience and kindness with "inspiring [her] to become a social worker" and to pursue dreams that would not have otherwise "seem[ed] reachable."  Letter of Glynesia Spurlock, App. at A-065.

### E.        The Civil War and Humanitarian Crisis in Yemen

Yemen has long been the poorest country in the Middle East and North Africa.  *See*
*The World Bank in Yemen*, WORLD BANK GRP. (Jan. 25, 2024),
https://www.worldbank.org/en/country/yemen/overview, App. at A-411.  In 2014, the year
Mr. Zaidi moved to the Middle East to begin his seminary studies, a Yemeni separatist
group, known as the Houthis, staged a coup and wrested control of the capital from the
government.  *See* JEREMY M. SHARP, CONG. RESEARCH SERV., R43960, YEMEN: CIVIL
WAR AND REGIONAL INTERVENTION (2021), App. at A-390.  Shortly thereafter, Saudi
Arabia formed a coalition of Arab states and unleashed a brutal barrage on the Houthi
rebels and, tragically, tens of millions of Yemeni civilians, who were caught in the
crossfire. *Id.*

Beginning in 2015, the Saudi-led coalition imposed an air, sea, and land blockade
ostensibly to "deter weapons smuggling" and pressure the Houthis into surrendering;
however, Yemeni civilians were the main victims of this suffocating tactic.  *Id.* at 6.  As
part of this blockade, the Saudi-led coalition and an arm of the United Nations conducted
cumbersome, two-step inspections of ships intended for Yemeni ports, delaying the
delivery of aid by as many as three months and causing food and medicine to expire in the
process.  *Id.*; *see* Selam Gebrakidan & Jonathan Saul*, In Blocking Arms to Yemen, Saudi
Arabia Squeezes a Starving Population*, Reuters (Oct. 11, 2017),
https://www.reuters.com/investigates/special-report/yemen-saudi-blockade, App. at A-
250 ("One … vessel[] was carrying antibiotics, surgical equipment and medication for
cholera and malaria for 300,000 people.  The shipment was held up for three months, during
which $20,000 worth of medicine was damaged or expired.").  Historically, Yemen has

imported approximately 90% of its food, and Saudi Arabia's blockade of Yemen's ports restricted the international community's ability to deliver vital humanitarian assistance to Yemeni civilians.  JEREMY M. SHARP, CONG. RESEARCH SERV., R43960, YEMEN: CIVIL WAR AND REGIONAL INTERVENTION (2021), App. at A-397.

To make matters worse, the Saudi-controlled central bank of Yemen began printing excessive amounts of Yemeni rials in 2016, cratering the value of the currency and making ordinary Yemenis' ability to purchase basic necessities that much more difficult.  Declan Walsh, *The Tragedy of Saudi Arabia's War*, N.Y. TIMES (Oct. 26, 2018), https://www.nytimes.com/interactive/2018/10/26/world/middleeast/saudi-arabia-war-yemen.html, App. at A-287.  By late 2018—coinciding with the starting date of the charged offenses—the situation in Yemen had deteriorated even further, creating famine-like conditions and a humanitarian emergency.  An article in The New York Times describes and offers photographs of the tragic conditions.  *See id.* at A-277–A-313.  As The Times reported at the time, "aid experts and United Nations officials say a more insidious form of warfare is also being waged in Yemen, an economic war that is exacting a far greater toll on civilians and now risks tipping the country into a famine of catastrophic proportions."  *Id.* at A-278.  The Times found that:  "[I]n the hushed hunger wards [of health care clinics], ailing infants hover between life and death. Of nearly two million malnourished children in Yemen, 400,000 are considered critically ill—a figure projected to rise by one quarter in the coming months."  *Id.* at A-286.

By late 2018, over one million Yemeni civilians had been displaced, and tens of thousands of civilians had been killed.  According to the U.N.'s former Undersecretary of Humanitarian Affairs, the situation in late 2018 represented "a clear and present danger of

an imminent and great, big famine engulfing Yemen." *See id.* at A-279.  Unfortunately,

these dire warnings proved accurate:  the Congressional Research Service estimates that,

as of today, more than 18 million Yemenis—over half the population—requires

humanitarian assistance, and 4.5 million Yemenis have been internally displaced.

CHRISTOPHER M. BLANCHARD, CONG. RESEARCH SERV., IF12581, YEMEN: CONFLICT, RED

SEA ATTACKS, AND U.S. POLICY (2024), App. at A-417.

      Much of the explanation for the devastating consequences to the Yemeni civilian

population was tied to the difficulty in getting aid to those in need.  The U.S. Agency for

International Development ("USAID") advised that the "most effective way people can

assist relief efforts is by making cash contributions to humanitarian organizations that are

conducting relief operations."  *Yemen – Complex Emergency*, USAID (July 16, 2021),

https://www.usaid.gov/sites/default/files/2022-05/07.16.2021_-
_USG_Yemen_Fact_Sheet_6.pdf, App. at A-375.  But, as many observers, including the

Center for Strategic & International Studies, noted, "[a]id organizations struggle[d] to meet

the staggering humanitarian needs in Yemen," in part, due to the lack of an internationally

"coordinat[ed] mechanism for the delivery of humanitarian aid" and the "financial isolation

of Yemeni banks."  Jon B. Alterman, *Aid and Conflict: Pitfalls in Yemen*, CTR. FOR

STRATEGIC & INT'L STUDIES (Aug. 16, 2018), App. at A-264; *Failure in Delivering Aid for

Yemenis "the Worst International Response to a Humanitarian Crisis", Civil Society

Briefer Tells Security Council*, United Nations SC/14661 (Oct. 14, 2021), App. at A-377.

With no end to the war in sight even today, the United Nations estimates that the "conflict-

attributable death toll will be 1.3 million" people, "80 per cent of [whom] will be children

under five," by 2030.  Taylor Hanna, David K. Bold, & Jonathan D. Moyer, *Assessing the*

*Impact of War in Yemen: Pathways for Recovery*, UNITED NATIONS (Nov. 23, 2021), App. at A-453.

### F.     The Offense Conduct

Mr. Zaidi and the Government agreed to a stipulated Statement of Offense, and that Statement of Offense accurately describes the offense conduct.  But additional explanation may be helpful in understanding Mr. Zaidi's actions and motivations.

Mr. Zaidi's offenses took place between approximately December 2018 and December 2019, and consisted of efforts by him and others to raise humanitarian aid money and to transfer those funds through Iran en route to Yemen for the benefit of suffering Yemeni civilians.  The brief layover of the funds in Iran was done out of necessity.  Saudi Arabia and its coalition had imposed a blockade around Yemen, and even the United Nations, USAID, and well-regarded humanitarian groups were finding it extremely difficult to deliver aid to those in need.  Like USAID, Mr. Zaidi and those working on the Yemen Campaign recognized that the "most effective way people [could] assist relief efforts [was] by making cash contributions to humanitarian organizations that [were] conducting relief operations."  *Yemen – Complex Emergency*, USAID (July 16, 2021), https://www.usaid.gov/sites/default/files/2022-05/07.16.2021_-_USG_Yemen_Fact_Sheet_6.pdf, App. at A-375.  The Islamic Pulse video in support of its Yemen Campaign, linked here (*see* https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign/), explains in a short, five-minute video how and why the campaign transferred humanitarian support in the manner it did.

To encourage charitable giving and to maximize its beneficial impact on Yemeni civilians in distress, the Yemen Campaign focused on collecting religious donations—

*khums*—to distribute to women, children, and other non-combatants in Yemen.[2]   The Quran requires every Shia Muslim to contribute *khums*, 20% of an individual's annual net earnings, to charity.   To fulfill one's religious obligation, the donor must receive a receipt from his or her chosen *imam* (or *marja*, which refers to the senior-most clerics in Shia Islam), confirming the donation.   *Khums* are divided into two equal parts paid to two categories of recipient:  one half of *khums* can be given to needy *syeds*, *i.e.*, descendants of the Prophet Muhammad, of the donor's choosing (the "Syed's Share"); the other half generally must be given to the donor's chosen *imam* (the "Imam's Share").   Each *imam* chooses how to spend the Imam's Share he receives.

In an effort to maximize the amount of *khums* that would go to the benefit of Yemeni civilians, Mr. Zaidi sought permission from the major *imams* to allow the Imam's Share to be donated to the Yemen Campaign for the benefit of Yemeni relief.   Even without this permission, the 50% Syed's Share of *khums* could be directed to Yemeni civilians, provided that the funds were directed to *syeds* in Yemen (a very substantial number of people).   Permission to also use the Imam's Share to alleviate suffering in Yemen meant that the Yemen Campaign could collect 100% of donors' *khums* to fund humanitarian relief.   In a letter dated December 5, 2018, Ayatollah Mohsen Araki, a senior *imam* located in Iran gave the requested permission in a letter:

<u>In the Name of God</u>

> Hereby, it is proclaimed that the use of religious funds such as the blessed Share of the Imam, peace be upon Him, alms, and settlements of certain debts, is permissible for the purpose of helping

---

[2] For a detailed discussion of *khums*, the Court may refer to sections II.A-B of the following *Texas Law Review* note and the sources cited therein:  Insiya Fatima Aziz, Note, *Sanctioning Free Exercise:  Religious Freedom and Financial Liberty*, 100 Tex. L. Rev. 387, 391-96 (2021).

the needy people of Yemen especially in their current difficult conditions where a large majority of the Yemeni Muslims lack shelter, are besieged and are under severe sanctions, and War and destruction of their houses and homeland have intensified their sufferings. May God reward this deed, and may it please the Vali-e Asr, our souls be a sacrifice to him.

Mohsen Araki

USAO-001128, App. at A-042.   Mr. Zaidi was ecstatic at the news; the ayatollah's permission meant that twice as much humanitarian relief could go to Yemeni civilians and twice as many Yemeni non-combatants could gain support.

In a secretly recorded telephone call with family members on December 5, 2018 (as translated by the Government), Mr. Zaidi expressed his excitement about the permission:

> I have got very good news that you can start spreading. I had a meeting with Ayatollah Ara[ki] yesterday. He has been [the L]eader's rep[resentative], like he was the Leaders rep[resentative] in UK for many years and now he is over here and he is considered one of the major personalities of the system. So anyways, I was trying to get permission for Kh[u]ms for the portion of Imam for the cause of Yemen, for Yemen's cause. Basically what he has done is that he gave me permission for a hundred percent to collect Kh[u]ms for the cause of Yemen. So, if you guys have an...or those who are the followers of the Rahbar [Leader] and if you want to pay your Khoms, Imam's portion can go towards Yemen's cause and for the humanitarian cause. and what do you say, you can let others know as well."

Sensitive_USAO-008403, App. at A-044.   On February 28, 2019, Zaidi received more good news; he received a second letter from Ayatollah Araki—this time making clear that the permission to use the Imam's Share for Yemeni relief applied to *khums* given on behalf of the other main Shia *imam*—Grand Ayatollah Sistani, who was located in Iraq.  USAO-001128, App. at A-043.

Over the next year, Mr. Zaidi and other seminary students raised donations for Yemeni humanitarian relief.  According to the Islamic Pulse video, the Yemen Campaign collected close to $90,000 from multiple countries, including the United States, and transferred those funds to Yemen.  The primary means by which Mr. Zaidi and others delivered U.S.-origin funds was by having visitors carry cash to Iran or Iraq for further transmittal to Yemen to circumvent the Saudi blockade.  Although receipts documenting the contribution of *khums* were given by the offices of Ayatollahs Khamanei and Sistani, the money raised by Mr. Zaidi was delivered to Yemen for humanitarian relief, pursuant to the written permission of Ayatollah Araki.

### G.       Mr. Zaidi's Arrest, Detention, and Terms of Pretrial Release

Mr. Zaidi was arrested on August 18, 2020 and detained until September 1, 2020. On the day of his arrest, FBI agents executed ten search warrants of his home and the homes of his family members and close friends.  Mr. Zaidi's arrest sent a shock wave throughout his family and the entire Shia Muslim community in Houston and elsewhere.  Mr. Zaidi was always known as a pillar of society and someone who put abidance by the law and his religion above all else.  Mr. Zaidi's family was in disbelief at the events that transpired: "The news was a shock for all my family because we knew that no matter how much of an enthusiastic person Muzzamil has been for the suffering people, he was always a strictly law-abiding citizen.  He may be critical about the policies of the governments that he lives under, however, we have always known him for raising voices within the boundaries of the law."  Letter of Mehdi Naqvi, App. at A-058; *see also* Letter of Syed Ajmal Kazmi, App. at A-119; Letter of Fakhar Zaidi, App. at A-076.

After fourteen days of pretrial detention, a Southern District of Texas Magistrate Judge ordered that Mr. Zaidi be released under very strict pretrial conditions over the

Government's objection. Specifically, the Magistrate Judge set a $7,500,000 bond secured by $50,000 in cash; home detention with permission to leave his home only for limited purposes; 24-hour/7-day per week GPS monitoring; the surrender of his U.S. and Pakistani passports, as well as all passports of his wife, children, mother, and siblings; and severe restrictions on communications with a number of close friends and family members. *See* Dkt. 9 at 3. He has adhered to the terms of his pretrial release since he was released from detention in September 2020.[3]

After seventeen months of home detention, on January 23, 2022, the Court modified the terms of Mr. Zaidi's pretrial release and imposed a curfew (rather than home detention)

---

[3] On August 2, 2024—shortly before Mr. Zaidi's sentencing—Pretrial Services filed a notice purporting to report that Mr. Zaidi had violated the condition of release requiring him to "avoid all contact" with certain specified individuals, including his co-defendant, Asim Naqvi. Pretrial Services noted that GPS monitoring showed that Mr. Zaidi and Mr. Naqvi had both been present at the same time when attending religious services at their mosque. But Mr. Zaidi and Mr. Naqvi—both observant Muslims who are part of the same religious community—are permitted to attend worship services (indeed, a pretrial release order that barred them from attending services would raise serious constitutional concerns). They are not permitted to have any contact with each other, and they have not done so, even when they have happened to attend the same service.

Similarly, Mr. Zaidi and Mr. Naqvi have occasionally both attended religious services held after the mosque services, at private homes. But these home-based services—which were attended by as many as 100 people—are, like the mosque services, part of Mr. Zaidi and Mr. Naqvi's religious observance. Mr. Zaidi has steadfastly abided by his obligation to avoid any contact with Mr. Naqvi on the times when their attendance at such services has coincided.

Finally, the Pretrial Services report asserts that two of the home-based services took place at homes belonging to individuals on the no-contact list: Quratulain Hadi (#10 on the list) and Syed Hani Mehdi Naqvi (#18 on the list). But Quratulain Hadi is Mr. Zaidi's sister, and the order setting conditions of his pretrial release explicitly permit him to have contact with her as long as they do not discuss his case. He has abided by that restriction, but there is no basis to consider his presence in her home to be a violation. And the home where Mr. Naqvi was present on July 15, 2024 is owned by Syed **Ali Arsalan** Naqvi, not Syed **Hani Mehdi** Naqvi. Mr. Naqvi's presence at the home was thus not a violation of the no-contact order.

at least in part because of the Government's recognition that Mr. Zaidi "has done well on supervision." Dkt. 68.  Even under the curfew, however, Mr. Zaidi was restricted to his home for the majority of the day and was subject to limits on his ability to travel outside the jurisdiction.  In his time permitted out of his home, Mr. Zaidi drove his children to and from school and their extracurricular activities, accompanied his pregnant wife to medical appointments, prayed at his local mosque, and provided counseling and teaching to those in his community and beyond.  Even during this period of personal difficulty, his brother, Fakhar Zaidi, commented that "Muzzamil has remained steadfast in his commitment to helping those in need, demonstrating remarkable resilience and strength."  Letter of Fakhar Zaidi, App. at A-077.  Indeed, a friend from Australia who frequently looks to Mr. Zaidi for advice and mentoring writes that, even in "the most challenging phase of his life," she "see[s] him delivering on all fronts [and] balanc[ing] his personal, family, and communal, and professional responsibilities remarkably well."  Letter of Marium Hossain, App. at A-055.

In addition to toll the charges have taken on Mr. Zaidi, the charges have been extremely hard on his immediate and extended family.  His children lost substantial access to their father when outside the four walls of their home.  Further, as a condition of Mr. Zaidi's release from federal custody, his wife, children, mother, and siblings in the country—all of whom are U.S. citizens and none of whom has been charged with any crime—were required to surrender their passports to Pretrial Services, leaving them unable to travel for religious pilgrimages without first obtaining leave of the Court.  Dkt. 9-1 at 3.  The Court vacated Mr. Zaidi's curfew on October 3, 2023, after Mr. Zaidi pleaded guilty, though he still is limited in where he is permitted to travel.  Dkt. 129.

## LEGAL CONSIDERATIONS IN IMPOSING SENTENCE

### A.      Applicable Legal Standard

Under to the "parsimony" clause of 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute.  *See United States v. White*, 984 F.3d 76, 90 (D.C. Cir. 2020).  The four specific purposes of sentencing identified in § 3553(a)(2) are as follows:

> [T]he need for the sentence imposed –
>
> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (2024).  The Court must impose the least severe sentence that will serve these purposes of sentencing.

In applying § 3553(a)(2), the Court also looks to the other § 3553(a) factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).  The Court must fashion a sentence that complies with the purposes of these factors and should consider the facts presented in the particular case when reaching its decision.  *Rita v. United States*, 551 U.S. 338, 351-52 (2007); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

**B.      Application of the § 3553(a) Factors**

Under federal sentencing legislation, Congress has instructed courts to consider several factors when devising sentences that are "not greater than necessary" to comply with the enumerated public policy objectives.  18 U.S.C. § 3553(a).  Applying each of the factors relevant to Mr. Zaidi's case makes clear that a sentence of time served is sufficient, but not greater than necessary, in light of the nature, seriousness, and underlying circumstances of Mr. Zaidi's offenses; his motivation for his actions; the non-existent risk of recidivism or danger to the public from Mr. Zaidi; the interest in not creating unwarranted sentencing disparities; and already-substantial punishment that Mr. Zaidi has received.

**1.      Nature, Seriousness, and Circumstances of the Offenses**

Mr. Zaidi fully accepts responsibility for breaking the law, but the nature, seriousness, and circumstances of his offenses should be considered in fashioning an appropriate sentence, and consideration of these factors justifies a sentence of time served. Unlike the majority of IEEPA or other sanctions violations, Mr. Zaidi was not transferring funds to assist the Iranian government, to support the military or development of weapons of mass destruction, or even to purchase dual-use technology or serve commercial purposes.  Nobody was put in danger as a result of Mr. Zaidi's conduct, and nothing he did was contrary to the interests of the United States.  Mr. Zaidi accepts that his conduct was unlawful, but it was victimless.

Here, Mr. Zaidi arranged for the transfer of funds through Iran to provide critical humanitarian support, and his actions were undertaken to save the lives of women, children, and other non-combatants whom the U.S. government, the United Nations, and non-governmental organizations described as facing a historic famine, life-threatening

disease, massive displacement, and other catastrophic conditions.  The charitable *khums* Mr. Zaidi raised and transferred overseas did not stay in Iran (with the exception of a small amount that went to Iranian flood victims); rather, the funds continued on to Yemen to provide vital aid for those in need.

Alleviating human suffering is a pillar of Mr. Zaidi's religious duties and one of the paramount purposes of his life.  Muhammad Jaffer, a friend for over a decade, writes that Mr. Zaidi's "unwavering dedication to standing up for human rights, regardless of differences in creed, ethnicity, or colour, has been truly inspiring.  I vividly recall his impassioned speech at our first demonstration, where he emphasi[z]ed the universal significance of the issues were addressing, transcending religious or cultural boundaries." Letter of Muhammad Jaffer, App. at A-066.  As the civil war in Yemen unfolded, Mr. Zaidi was engrossed in his seminary studies in Iran, but he was deeply disturbed by the catastrophic and famine-like conditions in Yemen and was desperate to find ways to help. As he describes it, "[t]he desperation to do something for those Yemeni civilians, who [he] never met, a country that [he] ha[s] never visited, who don't even share the same faith as [him] because mostly they are Sunni Muslims, prompted [him] to take action."  Letter of Muzzamil Zaidi, App. at A-005.  In late 2018, Mr. Zaidi and others affiliated with the Islamic Pulse devised a plan to raise and send money to Yemen to purchase "medicine and monthly food rations."   IP Yemen Campaign Video (July 6, 2019) (2:19-20), https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.   Money would be collected by Islamic Pulse and then passed on directly to recipients in Yemen.  Mr. Zaidi was not previously affiliated with Islamic Pulse, but offered his English-language skills and contacts to help reach as many potential donors as possible.

Because Shia Muslims have a religious obligation to pay *khums*, they are a useful donor base for fundraising efforts.  Mr. Zaidi and others sought to use *khums* to strengthen their ability to fundraise.  Under normal circumstances, donors are permitted to contribute the 50% Syed's Portion of *khums* to needy *syeds* of their choice, including those in Yemen.  But to double their impact, Mr. Zaidi sought and obtained permission (on behalf of both Ayatollahs Khamenei and Sistani) for Shia Muslims to also donate the other 50% of *khums*—the Imam's Share—to "help the needy in Yemen," rather than have the funds go to the Ayatollahs.  Mr. Zaidi did not secure the necessary permission because of any close connection to Iran's spiritual leaders—he has no such connection.  He received permission because Yemen was a worthy cause, and the permission meant that 100% of an individual's *khums* could be donated to ease the suffering in Yemen.  *See* Sensitive-USAO-008403, App. at A-044.

Islamic Pulse's Yemen Campaign video is just over five minutes long and includes photos of villages devastated by indiscriminate bombing, starving children, and a narrator urging people to donate, to post on social media, and to attend protests in solidarity with Yemeni civilians.

**Starving Yemeni Infant[4]**



The video included a solemn call to action: "The starvation, destruction, and bloodshed that is occurring in this war will leave us with our heads bowed in shame. We will become the generation that witnessed the most ruthless massacre recognized by the perpetrators and still did nothing about it. How can we just sit and let this continue?"  IP Yemen Campaign Video (July 6, 2019) (0:25-32), https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.  The video also included a message from Ayatollah Araki, who declared that "helping the people of Yemen is among the most compulsory of actions (*wajibat*)." *Id.* (3:35).

Despite the urgent need for civilian assistance, the tactics of the belligerents foreclosed many conventional avenues for individuals to deliver aid to civilians in need. Islamic Pulse highlighted some of these obstacles in its video:

> The problem is that even charity organizations which are trying to get their money into Yemen are not being able to because of the Saudi blockade. And let's not forget that the Saudi regime is not only stopping money from going into Yemen, but it's actually

---

[4] IP Yemen Campaign Video (July 6, 2019) (1:20-1:21), https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.

stopping food and medical supplies from entering as well.  They're essentially trying to block Yemen off from the rest of the world and starve them to death."

*Id.*    (0:58-1:20),        https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.

**Map of Saudi Blockade of Yemen[5]**



Because of his connections to the United States, Mr. Zaidi agreed to help collect money from people in the Houston area and elsewhere in the United State for the Yemen Campaign.  Based on his understanding to this day, the money Mr. Zaidi raised went to Yemeni civilians in need.  Though Islamic Pulse did not have a license from the U.S. Department of Treasury's Office of Foreign Assets Control allowing humanitarian aid to be routed through Iran, the ultimate recipients were Yemeni civilians in need.  And because donors who gave *khums* required a receipt to satisfy their religious obligations, Mr. Zaidi and the others involved in the Yemen Campaign obtained receipts from the relevant *marjas* on behalf of donors, confirming their *khums* payment.

---

[5] IP Yemen Campaign Video (July 6, 2019) (1:58), https://islamicpulse.tv/ivideo/islamic-pulse-funds-yemen-campaign.

In total, the Yemen Campaign raised over $90,000 to deliver "aid … consist[ing] of medicine and monthly food rations" for Yemeni civilians trapped in the conflict, likely saving hundreds of lives.  *Id.* (2:20).

### 2.    Motives for Mr. Zaidi's Actions

 Mr. Zaidi's motives for sending funds to Yemen were not to serve the Iranian government or any religious leader.  He did not act for profit, for reputation, or in any way for his own benefit.  He acted to save the lives of complete strangers who were in a state of distress.  Those who know Mr. Zaidi recognize and lament his violation of the law, but they also "see how Muzzamil's giving and helping nature must have motivated him to send much needed aid to [the] suffering people of Yemen."  Letter of Syed Hasan Jafri, App. at A-080.  As one long-time friend explains, "[m]any speak of such altruism, but it is rare to find someone like Muzzamil who is willing to sacrifice, put in extra effort, and do whatever is necessary in service of others."  Letter of Hasan Rizvi, App. at A-060.  A fellow parent and community member offers his "sincere belief that [Mr. Zaidi's] intentions and actions, though misguided in legality, were rooted in a deep-seated desire to alleviate suffering and promote human dignity."  *See* Letter of Hassan Hemani, App. at A-093.

The funds raised by Mr. Zaidi benefitted hundreds, if not thousands, of women, children, and other non-combatants in Yemen, not a foreign government or its leadership.  Safdar Abbas, a close friend, describes what he believes to be Mr. Zaidi's "real passion," which is "to help oppressed people everywhere in the world."  Letter of Safdar Abbas, App. at A-078.  He offers his view on how that passion led Mr. Zaidi to commit the offenses to which he has pleaded guilty:

> At the time [late 2018-late 2019], the greatest humanitarian issue was the famine in Yemen due to the prolonged five-year war.  At the time, I knew that there was a campaign going on in the

> community to raise funds for the oppressed people of Yemen.  Now
> looking in hindsight, I can confidently say that it was his extreme
> passion to help which prompted him to take the route that he took.

*Id.*  Syed Rizvi, an engineer in Houston who has known Mr. Zaidi for twelve years, offers

a similar view:  "I understand that Muzzamil has violated certain sanctions.  However, I

firmly believe that his intentions were purely humanitarian, aiming to assist the starving

and sanctioned people of Yemen.  He has expressed sincere regret for his actions,

recognizing the importance of adhering to the law."  *See* Letter of Syed Rizvi, App. at A-

081.  Mr. Rizvi explains that Mr. Zaidi's service to others was not limited to Yemen;

instead, he describes Mr. Zaidi's efforts in "volunteer[ing] at the local community center's

after-school program, spending his afternoons tutoring young students" in academics, and

"help[ing] coordinate a community drive that provided warm clothing and blankets to

families in distress" during a severe winter storm that affected the greater Houston area.

*Id.*

### 3.    Deterrence and Protection of the Public

Mr. Zaidi has never been in trouble with the law before, and there is no basis to

believe that he will ever be in trouble again.  Mr. Zaidi's offenses constitute aberrational

conduct resulting from a feeling of paralysis in the face of a human tragedy.  He accepts

that he violated the law and is intent on never doing so again.  The pain and distress that

Mr. Zaidi's actions have imposed on himself, his wife, children, extended family, and

friends have been immense; indeed, the "emotional trauma" and "anguish" he and his

family have endured as a result of this prosecution are more than enough to deter similar

conduct in the future.  *See* Letter of Fakhar Zaidi, App. at A-076–A-77; Letter of Muzzamil

Zaidi, App. at A-006.  Mr. Zaidi is resolute not to put himself or those he cares most about

to be in this situation again.  There is no need for further deterrence; Mr. Zaidi poses no risk of recidivism.

Mr. Zaidi poses no risk to the public or to society.  His offenses here were motivated by a desire to *help* others (who were strangers to him), not hurt them.  Indeed, Mr. Zaidi's actions caused no harm to anyone.  He did not put the United States or its interests at risk, nor did he provide a benefit to any foreign government.  His actions were not political; they were humanitarian.  According to Dr. Sayyed Farhan Ali Jaffri, a physician at TRS Health in Stafford, Texas, Mr. Zaidi is "a man of integrity who made a decision based on his desire to help others, and … he poses no threat to society.  On the contrary, he has consistently demonstrated his commitment to improving the lives of others."  *See* Letter of Sayyed Farhan Ali Jaffri, App. at A-068.  Offering support for his belief, Dr. Jaffri describes Mr. Zaidi's "pivotal role in creating and coordinating TRS Health, a healthcare system designed for underprivileged members of society."  *Id.* at A-067.  Now, TRS Health "serves thousands of individuals who previously had limited or no access to medical care."  *Id.*

As recognized by Dr. Jaffri and many other supporters, rather than posing a danger to the public, Mr. Zaidi has been an incredible contributor to the public good.  He has put in countless hours providing support for his community—without regard to religion, race, or ethnicity—and the hundred-plus letters of support offer detailed accounts of how Mr. Zaidi has offered, and continues to offer, his counseling, spiritual guidance, and support to those in need without compensation.  A friend, Saira Hasan of Ontario, Canada, describes Mr. Zaidi as a "man of honour, integrity, trust, support with a heart of gold," and recounts how he helped her in one of the most difficult times of her life:

> It was the year 2008 while I was going through hardships during my relationship where I remember him as being the only one who was

32

> older than me, who made me feel seen, heard & understood.  He has
> this immense ability to make the others feel safe and even though I
> was a 20-year-old girl struggling to understand her own emotions,
> bhai [an Urdu term of endearment] taught me how to advocate for
> myself and acknowledge my emotions.  He taught me the
> importance of believing in myself which gave me confidence and
> the strength to continue & to not give up in life.

Letter of Saira Hasan, App. at A-069.  Another friend of twenty-two years writes that Mr.
Zaidi is "the kind of person who would drop everything to support a friend in need," and
someone willing to offer "a listening ear during a difficult time or providing practical help
when [he] needed it most."  Letter of Syed Taqvi, App. at A-082.

But Mr. Zaidi's public service is not limited to family or close friends:  letters of
support recall "countless hours of service to help those in need" at local community centers;
respect and support for the homeless or the downtrodden; and his willingness to "always
take[] the lead in helping the destitute of the community."  Letter of Mohammed Mithani,
App. at A-104; Letter of Naseem Jaffer Ali, App. at A-112; *see also* Letter of Syed Irtiza
Rizvi, App. at A-105; Letter of Shahana Momin, App. at A-124.  Seyed Ali Abedi, the
Principal of Al-Hadi School, where Mr. Zaidi's children attend classes, describes Mr. Zaidi
as a "caring and compassionate individual who advocates for the general welfare of all
students, particularly those who may not have parent advocates."  Letter of Seyed Ali
Abedi, App. at A-086.  In his fifteen-year experience as an educator, Mr. Abedi notes that
he has "found few parents who are as invested in the overall success of a school to make it
their concern to ensure *all* students are treated fairly and with dignity."  *Id.*  A teacher who
knows Mr. Zaidi from the community explains that Mr. Zaidi's "passion for helping the
impoverished is a flame that ignites his empathy into action, fueling a relentless pursuit of
meaningful change.  For Br. Muzzamil, this transcends mere sympathy, embodying a deep-

seated commitment to alleviating suffering and restoring dignity for all."  Letter of Naseem

Jaffer Ali, App. at A-112.

### 4.      Interest in Avoiding Unwarranted Sentencing Disparities

The interest in avoiding unwarranted sentencing disparities is complicated here

because the nature of Mr. Zaidi's offenses are so unique; indeed, Mr. Zaidi's counsel's

research has not identified any other criminally charged IEEPA violation where the

defendant's conduct was strictly humanitarian in nature.  Counsel has also been unable to

locate—in U.S. Department of Justice Press Releases or through Westlaw searches—any

other instance in which sanctions-related criminal charges were brought for the transmittal

of funds through a sanctioned country en route to another country to support civilians

facing famine, disease, and other catastrophic conditions.  Accordingly, there is no direct

comparison since cases like this seemingly have not been brought before.

The closest comparisons may be cases involving IEEPA or sanctions violations

where, as here, the relevant conduct involved the export of goods to a sanctioned country

for purposes other than supporting a terrorist government or its military.  But even those

cases involved a profit motive—the transfer of commercial goods or services for personal

profit—not humanitarian relief.  In *United States v. Hashemi*, for instance, this Court

sentenced the defendant to time served for attempting to export U.S.-made measuring tapes

used in the aviation and oil industries.  *See United States v. Hashemi*, No. 15 Cr. 00075

(GK) (D.D.C. 2015); *see also United States v. Bhatt*, 19 Cr. 294 (ESH) (D.D.C. 2019)

(defendant given probationary sentence for unlawfully exporting thermal imaging camaras

that also had military use to UAE but destined for Iran); *United States v. Amed*, No. 17 Cr.

290 (JEB) (D.D.C. 2022) (defendant who "caused around $240 million worth of financial

services to be exported to Iran" sentenced to three-years' probation); *United States v.*

*Edalatkhah*, No. 10 Cr. 00308 (EGS) (D.D.C. 2010) (defendant who exported 430 units of computer equipment to Iran sentenced to time-served); *United States v. Ravanasa*, No. 09 Cr. 214 (RCL) (D.D.C. 2009) (imposing five-year-probationary sentence for defendant's attempts to transfer of American parachute materials and fabrics to Iran); *United States v. Sevilla*, No. 04 Cr. 171, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (imposing probationary sentencing on defendant for sending "United Computer Inclusive Hydraulic Floor Model Testing Machine" for use in Iran). As the district court in the Northern District of Illinois recognized (in sentencing a defendant to a sixty-day term of imprisonment for an IEEPA-violation involving the shipment of fire suppression equipment to Iran), "courts generally do not impose harsh punishment on embargo crimes that involve non-military goods." *See United States v. Groos*, No. 06 Cr. 420, 2008 WL 5387852, at *8 (N.D. Ill. Dec. 16, 2008) (citing cases).

Another case bearing important similarities to Mr. Zaidi's is *United States v. Saleh*, No. 2:17 Cr. 20541 (E.D. Mich. 2019), a case involving charges for the unlicensed transfer of millions of dollars to Yemen from 2009 to 2016. In *Saleh*, the court rejected the Court rejected the 43- to 54-month Guidelines sentence agreed by the parties, and instead imposed a one-day, time-served sentence, noting that there was no evidence that the transferred funds were used to finance terrorism or other unlawful conduct, or otherwise cause harm to U.S. persons. *See* Judgment in a Criminal Case, *United States v. Saleh*, No. 2:17-cr-20541 (E.D. Mich. 2019), App. at A-270–A-276; *Men Who Sent Millions to Yemen Spared Prison*, Associated Press (Oct. 21, 2019), https://www.courthousenews.com/men-who-sent-millions-to-yemen-spared-prison

("*Saleh* Article"), App. at A-500–A-502.  Shortly before sentencing, the Court recognized the conditions in Yemen at the time were "horrendous."  *See id.*

Mr. Zaidi's Guidelines range is far more severe than sentences described above and actual sentences imposed under the relevant Sentencing Guideline, § 2M5.1, for defendants having an Offense Level of 21 and a Criminal History Category of I.  According to the PSR, since 2019, there have been four unidentified defendants "whose primary guideline was § 2M5.1, with a Final Offense Level of 21 and a Criminal History Category of I," and they received an average sentence of 14 months."  PSR ¶ 186.  A substantially lesser sentence—a sentence of time-served—is appropriate.

And finally, Guidelines § 2M5.1, entitled "Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism," applies to conduct far more serious than the transfer of funds to Iran en route to Yemen for humanitarian relief. Indeed, most reported cases involving Iran where § 2M5.1 applies concern defendants who exported dual-use or military items to Iran or helped the Government of Iran conduct subversive activity in the United States.[6]  Unlike many other Guidelines sections, § 2M5.1 does not include increases or reductions in Offense Level based on the specific offense characteristics, which, in some cases, has resulted in the application of a sentencing

---

[6] In *United States v. Paidar*, for instance, this Court sentenced the defendant to twenty-eight months' imprisonment for "conspir[ing] to procure and export U.S. technology for Iran," namely a "device that can test the efficacy and power of fuel cells and … a bio-detection system that has application in weapons of mass destruction (WMD) research and use."  *See Justice Department Announces Charges and Sentence in Connection with Iranian Procurement Network's Attempts to Acquire Sophisticated Military Technology*, U.S. DEP'T OF JUSTICE (Mar. 22, 2023), App. at A-495–A-496.  Unlike in *Paidar*, Mr. Zaidi raised and helped transfer fund through Iran exclusively for humanitarian ends; they did not support the Government of Iran or its state-sponsored terrorist activity.  Mr. Zaidi's situation is far more comparable to (and even less serious than) the defendant in *Hashemi*.

enhancement targeted at IEEPA violations involving exports related to weapons of mass destruction to cases involving non-military exports.  *See* Eleanor L.P. Spottswood, *Reviewing Federal Sentencing Policy, One Guideline at a Time*, 89 N.Y.U. L. REV. 769, 790-91 (2014), App. at A-222, A-224.  To rectify this perverse result, courts have departed significantly from the sentences recommended in § 2M5.1 where, as here, "the defendant had no other criminal history, the volume of commerce was minimal [or nonexistent], there [was] no evidence that [the] export was made with … terroristic intent, and the goods were not a product that threatened controls relating to the proliferation of nuclear, biological, or chemical weapons."  *See, e.g.*, *Groos*, 2008 WL 5387852, at *7, *10.

### UNRESOLVED PSR OBJECTIONS.

There are several unresolved objections in the PSR, which we address in further detail below for the Court's resolution pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B).  *See United States v. McCants*, 434 F.3d 557, 561 (D.C. Cir. 2006) (holding that Rule 32 requires district court to resolve disputed portions of the presentence report on the record or explicitly disclaim reliance on the disputed facts).

### Paragraph 53

Paragraph 53 of the PSR references a trip that Mr. Zaidi and other seminary student took in 2018 to Syria and states that his travel aboard "an armed GOI military or intelligence airplane" necessarily "implies a close connection to the GOI and IRGC." Either the paragraph or the statements regarding a "close connection" to the Iranian government should be stricken and the PSR amended.  Mr. Zaidi does not have a connection to the Iranian government or any agency or instrumentality of Iran, and there is no support for the supposed "implication."

Mr. Zaidi traveled to Syria in 2018 in connection with a humanitarian mission, and his personal journal of the trip ("Syria Journal"), which is cited as the factual support for this paragraph, paints a very different picture of the trip than presented in the PSR. As detailed in this day-to-day chronicle of his trip, Mr. Zaidi traveled to Syria with other seminary students to provide humanitarian aid to civilians in a war-torn country and witnessed first-hand the devastation the war had taken on the country. Mr. Zaidi reports on the "horrific feeling" of passing through "a region that was completely bombarded" with "absolutely no sign of life"; recounts his "mixed emotions" while watching a "2-3 year old" orphan try to feed himself *iftaar* (the evening meal during Ramadan to break the fast); and expresses his "embarrass[ment]" when his group underestimated the number of needy guests that would attend a meal and ran out of food. Syria Journal, App. at A-011, A-014, A-017.

In one poignant passage of his Syria Journal, Mr. Zaidi described his sense of responsibility to alleviate the suffering he witnessed:

> While walking down the street, we ran into a building which had absolutely nothing in it. It was hard to believe that somebody was actually living over there. I literally broke down over there seeing a woman living with her kids on the rocks. It was a moment of self-reflection of our responsibility and accountability towards our fellow human beings. We are so indifferent and so selfish and so occupied in our lives that we can't even find time to even pray for thes[]e individuals, let alone doing something which involves some sacrifice.

*Id.* at A-020. Mr. Zaidi's travel, along with every other seminary student, on a military plane between Syrian cities does not imply any "close connection" with any government. To the contrary, Mr. Zaidi's Syria Journal demonstrates that the students had no idea how they would be traveling until shortly before the flight. *See id.* at A-016 ("The flight to Deir Ezzoor was an experience of its own. When we got to the airport, we got the feeling that

it is not a normal flight that we will be taking. In fact, it is going to be a flight that we have never taken before.").

PSR ¶ 53 is lifted from an August 17, 2020 affidavit by FBI Special Agent Joseph W. Ferrell in support of Mr. Zaidi's criminal complaint ("Ferrell Affidavit"). *See* Dkt. 1-1. But the Ferrell Affidavit does not describe any research, training, or experience that qualifies Agent Ferrell to opine on the significance of the flight at issue; in fact, Agent Ferrell had only been with the FBI for fifteen months at that time and his previous experience did not qualify him to be an expert on Iran. *Id.* ¶ 1. Agent Ferrell's speculation should be disregarded and the paragraph stricken.[7]

**Paragraph 65**

Similarly, PSR ¶ 65 is taken from the Ferrell Affidavit and includes reference to a recorded telephone call during which Agent Ferrell claims Mr. Zaidi "implied to his associates he had connections with senior officials within the GOI." *See id.* ¶ 44. Again, Mr. Zaidi simply does not have any close connection to the Iranian government or senior officials within it, and Agent Ferrell's speculation should not be accepted as proof otherwise. The conversation at issue was held in Urdu, and Agent Ferrell acknowledges that he is merely relying on "preliminary translations of statements that were made in the Farsi or Urdu language." *Id.* ¶ 3. His conclusions about the implications of a foreign-language conversation based on "preliminary translations" are not reliable.

---

[7] In addition, the Ferrell Affidavit includes "information provided to [him] by other law enforcement agents" and "the training and experience of other law enforcement agents." Dkt. 1-1, ¶ 3. Given that the source of this information is not identified, the Ferrell Affidavit does not provide sufficient "indicia of reliability" to justify any factual findings in the PSR. *See, e.g.*, *United States v. Marrero-Pérez*, 914 F.3d 20, 24 (1st Cir. 2019).

The government-provided translation of the September 26, 2019 phone call in question shows that Mr. Zaidi was troubleshooting solutions for a contact who was presently detained in Iran based on the Iranian officials' report that his passport had been stolen.  Confidential-USAO-000969, App. at A-360.  Mr. Zaidi described issues that others had faced with Iranian immigration officials, and suggested solutions, including that he might be able to help procure an exit stamp.  *Id.*  Far from suggesting that Mr. Zaidi had connections with high-level Iranian government officials, the conversation, in context, implies that Mr. Zaidi had some familiarity with navigating Iranian immigration authorities because *he too had experienced immigration difficulties* (hardly evidence of someone with high-level governmental connections)—"Muzzamil laughs and says that people from the seminary get shocked at the issues that he faces."  *Id.*

The July 14, 2019 phone call in which Mr. Zaidi spoke to someone who described himself and Mr. Zaidi as "soldiers of the Supreme Leader of Iran and Imam-e-Zaman" is similarly innocuous and does not support any factual conclusion about Mr. Zaidi's relationship to the Government of Iran or Ayatollah Khamenei.  In the conversation, Mr. Zaidi and "Person A" were discussing an argument over ideological differences between Person A and a third person.  Sensitive_USAO-004349, App. at A-358.  Mr. Zaidi played the role of a peacekeeper, reminding Person A that "we are all believers of the Honorable Rahbar."  Person A agreed, saying "[W]e are soldiers of him [] and Imam-e-Zaman."  This is a simple statement of religious observance, nothing more.[8]

---

[8] Christians speak in comparable military metaphors about their religious observance.  2 Timothy 2:3 exhorts its reader to be "a good soldier of Jesus Christ," Philippians 2:25 and Philemon 1:2 refer to Paul's readers as his "fellowsoldier[s]," and Ephesians 6:3 urges Christians to assume "the whole armour of God."  And Christians have sung the eighteenth-century hymn *Soldiers of Christ, Arise* at religious services for centuries, without enlisting

**Paragraph 69**

Paragraph 69 describes an article in the Tehran Times covering an event that Mr. Zaidi participated in while residing in Iran, at which anti-American chants broke out and the American flag was trampled.  Mr. Zaidi was not associated with either such activity.  But even if he were, Mr. Zaidi is a United States citizen with First Amendment rights. *Al Bahlul v. United States*, 767 F.3d 1, 66 n.3 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part) ("[T]he U.S. Constitution applies to U.S. citizens worldwide . . . .").  The Constitution protects political speech, even if distasteful.  *See Texas v. Johnson*, 491 U.S. 397 (1989); *Cohen v. California*, 403 U.S. 15 (1971).[9]  This paragraph should be stricken as it seems to have no purpose but to smear Mr. Zaidi for others' political speech at an event he attended.

## CONCLUSION

Mr. Zaidi fully accepts that his actions were unlawful and, no matter his motivation, he was required to operate and should have operated within the boundaries of the law.  He sincerely regrets the pain and anguish that he brought upon his family, friends, and community, and the time and resources that were required to be devoted to the case by the Court and the government.  His conduct was driven purely by the goal of helping those

---

in the armed forces.  *See, e.g.*, *Soldiers of Christ, Arise*, CTR. FOR CHURCH MUSIC, https://songsandhymns.org/hymns/detail/soldiers-of-christ-arise (last visited Aug. 5, 2024), App. at A-492.

[9] In the same way, the Constitution protects Mr. Zaidi's right to believe that Ayatollah Khamenei is a religious leader, as millions of Shia Muslims do.  So, too, does the Religious Freedom Restoration Act, which prohibits the federal government from "substantial[ly] burden[ing]" his religious practice unless the burden the least restrictive means of serving a compelling government interest.  42 U.S.C. 2000bb-1.  The Government cannot seek a harsher sentence for Mr. Zaidi's crime—transporting money into Iran (en route to Yemen)—based on the fact that he respected Ayatollah Khamenei as a religious leader when he committed the crime.

desperately in need—women, children, and other non-combatants of Yemen during the 2018 to 2019 blockade.  Mr. Zaidi poses no risk of recidivism; he will never run afoul of the law again.  Mr. Zaidi has already spent fourteen days in detention in the Harris County Jail, seventeen months of home detention, and two-and-a-half years under strict curfew conditions.  *See United States v. Gripper*, 2022 WL 541226, at *6 (M.D.N.C. Feb. 23, 2022) ("Home detention is still detention, and it imposes significant restrictions on an inmate's mobility and freedom."); U.S.S.G. § 5C1.1(e) (identifying "[o]ne day of home detention" as a "[s]ubstitute [p]unishment" for "one day of imprisonment").   He respectfully submits that a sentence of time served is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Dated:       New York, New York
             August 6, 2024

                              Respectfully submitted,


                      By:  _____

                              Daniel S. Ruzumna
                              Muhammad U. Faridi
                              PATTERSON BELKNAP WEBB & TYLER LLP
                              1133 Avenue of the Americas
                              New York, NY 10036
                              druzumna@pbwt.com
                              mfaridi@pbwt.com
                              (212) 336-2000

                              *Counsel for Defendant Muzzamil H. Zaidi*